**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TAMARA FOODS, INC., Respondent.**

No. 81–2318.

United States Court of Appeals, Eighth Circuit.

Submitted May 19, 1982.

Decided Nov. 17, 1982.

Rehearing and Rehearing En Banc Denied Dec. 14, 1982.

---

Edward Dorsey, Atty., N.L.R.B., Washington, D.C., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Law Offices of Gerald Tockman, Attorney at Law, A Professional Corporation, Gerald Tockman, St. Louis, Mo., for respondent Tamara Foods, Inc.

Before HEANEY, Circuit Judge, HENLEY,* Circuit Judge, and BECKER,** Senior District Judge.

William H. BECKER, Senior District Judge.

The National Labor Relations Board (NLRB) has filed in this Court an application for enforcement of its order issued on September 30, 1981, against Tamara Foods, Inc. (Tamara) pursuant to Section 10(a)–(c), 29 U.S.C. § 160(a)–(c) of the National Labor Relations Act (Act) as amended, 29 U.S.C. §§ 151, *et seq.* That Decision and Order of the NLRB is reported at 258 NLRB 180, 108 LRRM 1218. The Decision and Order of the NLRB disagreed with the Decision of an Administrative Law Judge (ALJ) recommending an order of dismissal of the complaint against Tamara by the Regional Director of the NLRB, charging unfair labor practices in violation of Section 8(a)(1) and Section 7 of the Act.

The material parts of (1) the Decision of the ALJ and (2) the Decision and Order of the NLRB are quoted hereinafter.

### Decision of the ALJ

A complaint before the NLRB and Notice of Hearing before the ALJ, based on

---

\* The Honorable J. Smith Henley assumed senior status on June 1, 1982.

\*\* The Honorable William H. Becker, Senior District Judge, Western District of Missouri, sitting by designation.

charges by employee Sharon Tueton, of unfair labor practices, against employer Tamara, were filed and served on Tamara, by the Acting Regional Director of Region 14. After the filing of an Answer by Tamara denying the charges of unfair labor practices, the issues were heard before an ALJ who filed the following Decision:

Statement of the Case

\*     \*     \*     \*     \*     \*

"At issue is whether Respondent unlawfully discharged 11 employees who clocked out before the end of their shift to protest allegedly unhealthy working conditions.

"Upon the entire record, including my observation of witness demeanor, I hereby make the following:

\*     \*     \*     \*     \*     \*

"The relevant facts are simple and essentially undisputed.

"Respondent, in the preparation of frozen onion rings and mushrooms, uses an ammonia refrigeration system. From time to time, ammonia has leaked into the atmosphere of the production areas, causing temporary respiratory discomfort. In addition, the processing of the onions temporarily causes tearing. At all relevant times, there has been a ventilation system in the work areas and an evacuation plan, both of which meet the standards imposed by the Department of Labor's Occupational Safety and Health Administration.

"The following employment policies, fully understood by the employees, were in effect at all relevant times:

1. Sick leave would be granted automatically to any employee upon request.

2. Any employee who believed that there existed an unsafe or unhealthy condition at the plant was permitted to leave the work station and remain in the lunchroom or outside the plant, with full pay, until the condition was corrected.

3. Any employee who otherwise clocked out prior to the end of the shift would be discharged.

"On September 11, 1980, shortly after commencement of the shift at 7:00 a.m., a number of employees smelled ammonia, left their work stations and proceeded to the lunchroom which was free of ammonia fumes. Shortly thereafter, supervisor Bury called the employees back to the production area. Again, the employees smelled ammonia and again they returned to the lunchroom. Three employees went outside for fresh air. Supervisor Bury again called the employees back to work, reporting that the condition had been corrected. Once again the employees detected ammonia and, for the third time, left their stations. Of the approximately 50 employees in the production area, all remained at the plant, except 11 who clocked out at approximately 9:18 a.m. All employees were assured by plant manager Schopp that, consistent with Company policy, they could 'sit around on their butts' and be paid for the full shift. He also reminded them that they would be discharged if they clocked out.

"The 11 employees who did clock out were discharged for that reason alone. None of the 11 employees thereafter requested reinstatement; each testified they had intended to report to work the following day.

"Based on their testimony at this hearing and at unemployment compensation proceedings, I find that none of the 11 had left the plant because of illness, none had requested sick leave and none had sought medical attention thereafter.... Their reason for clocking out prior to the end of the shift was best stated by employee Bressie:

> ... we all decided that if we would go in a group, that something might be done about it instead of just, you know, leaving by yourself. (Tr. 163)

At no time, before or after they clocked out, did the employees present any demands to Respondent concerning working conditions.

"On July 19, 1979, 14 months prior to the incident which gave rise to this proceeding, the Occupational Safety and Health Administration, acting on an employee complaint of ammonia leaks, conducted an on-site inspection of the production areas and refrigeration system and interviewed a number

of employees. No environmental violations were found and it was recommended that Respondent remove employees from affected areas when vapors were present. Thereafter, such a policy was implemented by Respondent. By letter dated August 10, 1979, the complaining employee was informed by OSHA that 'no alleged violations of Safety and Health Regulations were found as referenced in your complaint of ammonia leaking from the new freezer.'

"During the period of September 5–11, 1980, acting on a late August or early September 1980 complaint of one of the employees involved in this case, OSHA conducted another on-site inspection of the production areas and refrigeration system. Again, the environment was found to be safe, the ventilation system was found to be adequate, and, based on the compliance officer's interviews with management and employees, 'the procedure for handling ammonia leaks and evacuation procedures appeared to be adequate.' No violations were detected and the complaining employee was so notified by OSHA letter dated September 24, 1980.

"Counsel for the General Counsel's theory is straightforward: The 11 employees, in protesting working conditions, were engaged in protected concerted activity, despite Respondent's compliance with OSHA standards and its policy to continue to pay employees who leave their work areas because of a belief that conditions are unhealthy and that, as economic strikers, they may be replaced but not discharged. In support thereof, she relies principally on *N.L.R.B. v. Washington Aluminum Co.,* 370 U.S. 9 [82 S.Ct. 1099, 8 L.Ed.2d 298], 50 LRRM 2235 (1962).

"For the reasons set forth herein, I conclude that the activity, although clearly concerted, was unprotected under Section 7 of the Act.

\* \* \* \* \* \*

"The 11 employees had no objective reason to fear that performance of their assigned task might result in personal harm. A safe workplace is not the equivalent of a risk-free one. To be unsafe, it must threaten employees with a significant risk of harm. *Industrial Union Dept., AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 100 S.Ct. 2844 [65 L.Ed.2d 1010] (1980). Ammonia leaks were quite infrequent and, while employees suffered discomfort, there is no evidence of actual illness and no evidence of any harmful effects of ammonia fumes. The refrigeration system and Respondent's evacuation plan met all OSHA standards and employees were so advised in 1979 and again in September 1980. Significant is the fact that they were not compelled to remain in the vicinity of the fumes; their immediate assignments at the time of their untimely departure were to stand by in the lunchroom or outside the plant to await repair of the equipment. There was, in fact, no risk of harm whatever to any production employee.

"Moreover, the employees, as they had a right to do, already had initiated, under the Occupational Safety and Health Act, a complaint process which would lead to a Department of Labor compliance inspection. Previously, in 1979, an employee complaint of ammonia leaks resulted in an on-site inspection and a written opinion to the employee that no violations were detected. A second complaint, initiated only days prior to September 11, had rapidly brought to the plant another OSHA compliance officer and that inspection was in process on the very day that the 11 employees clocked out in order 'that something might be done about [the ammonia fumes].'

\* \* \* \* \* \*

"Finally, at no time before or after their 'strike' did the employees present a demand to Respondent. To be protected, a concerted protest of working conditions under Section 7 of the Act necessarily must be accompanied by a demand made upon the employer before, after or at the time of the activity.

\* \* \* \* \* \*

"Taken singly or together, the circumstances compell (sic) the conclusion that the actions of the 11 employees in clocking out before the end of the shift on September 11,

1980, were indefensible and thus unprotected, in that they demonstrated a gross disloyalty to their employer and were unnecessary for the protection of their legitimate concern for a safe and healthy workplace.

\* \* \* \* \* \*

ORDER

"IT IS ORDERED that the complaint be, and the same hereby is, DISMISSED. (Footnotes omitted.)"

### Decision and Order of NLRB

Counsel for the General Counsel of the NLRB filed before the NLRB, timely exceptions to the Decision of the ALJ. After a hearing on the exceptions, briefs and record before the ALJ, a three member panel of the NLRB entered a unanimous Decision and Order concluding that Tamara violated Section 8(a)(1) of the Act, and ordered Tamara to cease and desist, and to take affirmative corrective action. It is enforcement of this Decision and Order that the NLRB seeks in this Court. The pertinent parts of the Decision and Order are as follows:

"The Board has considered the record and the attached Decision in light of the exceptions and briefs and has decided to affirm only so much of that Decision as is consistent with this Decision and Order.

"The complaint in this proceeding alleges that Respondent violated Section 8(a)(1) of the Act by unlawfully threatening to discharge and discharging 11 employees for engaging in a strike over unhealthy working conditions. The Administrative Law Judge dismissed the complaint on the ground that the activity of the 11 employees, although concerted, was not protected by Section 7 of the Act. As further explained below, we find that the Act protects the rights of employees to strike over what they honestly believe to be unsafe and unhealthy working conditions, and we find, consequently, that Respondent's threat of discharge and its discharge of these employees for exercising those rights violated Section 8(a)(1).[1] [1 The Administrative Law Judge failed to make a specific finding on the General Counsel's allegation, contained in par. 5 of the complaint, that Respondent violated Sec. 8(a)(1) of the Act by threatening to discharge employees who clocked out of the plant to protest their working conditions. The record shows that this issue was fully and fairly litigated at the hearing. Accordingly, we consider this issue to be properly before us.]

"Respondent, which is engaged in the business of preparing and selling frozen foods, uses an ammonia refrigeration system to freeze its products. On several occasions ammonia gas from the refrigeration system leaked into the production area where Respondent's employees work. Employees testified without contradiction that the ammonia fumes had caused them to experience nausea, burning sensations in their noses and throats, headaches, tightness in their chests, and difficulty in breathing.

"Respondent recognized the problem of occasional ammonia leaks and had unilaterally promulgated work rules to be followed in such situations.[2] [2 Respondent's employees are not represented by a labor organization and Respondent's plant rules, therefore, are not part of any collective-bargaining agreement.] Under these rules, sick leave was to be granted automatically to any employee upon request; any employee who believed that an unsafe or unhealthy condition existed at the plant would be permitted to leave his or her work station and remain in the lunchroom or directly outside the plant, with full pay, until the condition was corrected; and any employee who clocked out prior to the end of the shift would be discharged.

"On the morning of September 11, 1980, 15 or 20 minutes into the start of the 7 a.m. shift, the employees in the production area smelled ammonia leaking from the freezer system and began to feel its noxious effects. The employees, on their own initiative, left the production area and congregated in the lunchroom. Supervisor Helen Bury was then informed of the leakage and the employees were told to wait in the lunchroom until the problem was corrected.

"Approximately 45 minutes later, Supervisor Bury informed the employees that the ammonia leakage had been stopped and directed them back into the production area. When the employees returned to the production area they found that it still contained ammonia fumes and was, in fact, worse then (sic) before. After working for 10 or 15 minutes, the employees retreated to the lunchroom for a second time and again reported the problem to Supervisor Bury. A number of employees went outside the plant for fresh air. Shortly thereafter, the employees were again assured that the ammonia problem had been corrected and were directed to return to the production area.

"Upon their return to work for a third time, the employees continued to feel the harmful effects of the ammonia fumes. At this point, the entire complement of employees left their work stations. Many of the 50 employees began to clock out.

"Supervisor Bury tried to convince the employees to stay at the plant and told them they could remain in the lunchroom and be paid for waiting until the ammonia problem was corrected. Several employees objected, however, and said that they were not going to wait at the plant. When Plant Manager A.J. Schopp noticed that employees were waiting in line to clock out, and was told that several employees had already done so, he told them that they had 'better go clock back in' and that those who clocked out should not 'bother coming in tomorrow.' Schopp further stated that any employees who left work should consider themselves fired.

"After Schopp's statement that clocking out would mean discharge, most of the employees decided to remain at the plant. Some of those who had already clocked out, clocked back in. However, 11 employees remained clocked out and left the plant, for which they were discharged.

"The Administrative Law Judge found, and we agree, that the action of these 11 discharged employees was clearly 'concerted activity' within the meaning of the Act. However, unlike the Administrative Law Judge, we find that the conduct was also clearly protected.

"It has long been established that Section 7 of the Act protects the rights of employees to engage in protests, including work stoppages, over what the employees believe to be unsafe or unhealthy working conditions. *N.L.R.B. v. Washington Aluminum Company,* 370 U.S. 9 [82 S.Ct. 1099, 8 L.Ed.2d 298] (1962); *Union Boiler Company,* 213 NLRB 818 (1974); *Du-Tri Displays, Inc.,* 231 NLRB 1261 (1977); *E.R. Carpenter Co.,* 252 NLRB No. 5 (1980); *Service Machine & Shipbuilding Corp.,* 253 NLRB No. 88 (1980).

"In *N.L.R.B. v. Washington Aluminum, supra,* a case which closely parallels the instant proceeding, the U.S. Supreme Court held that employees have the right under Section 7 of the Act to walk off their jobs, without prior notice to their employer and without following established plant rules forbidding employees from leaving their work stations without permission, if their action is a means of protesting what they perceive to be intolerable working conditions. The general rule is that the protections of Section 7 do 'not depend on the *manner* in which the employees choose to press the dispute, but rather on the *matter* that they are protesting,' *Plastilite Corporation,* 153 NLRB 180, 184 (1965), enfd. in pertinent part 375 F.2d 343 (8th Cir.1967). Inquiry into the objective reasonableness of employees' concerted activity is neither necessary nor proper in determining whether that activity is protected. As we stated in *Plastilite Corporation, supra,* 'we must respectfully disagree with any rule which would base the determination of whether a strike is protected upon its reasonableness in relation to the subject matter of the labor dispute. When a labor dispute exists, the Act allows employees to engage in concerted activity which they decide is appropriate for their mutual aid and protection, including a strike, unless ... that activity is specifically banned by another part of the statute, or unless it falls within certain other well-established proscriptions.' Whether the protested working condition

was actually as objectionable as the employees believed it to be, or whether their objection could have been pressed in a more efficacious or reasonable manner, is irrelevant to whether their concerted activity is protected by the Act, *International Van Lines,* 177 NLRB 353, 364 (1969); *Du-Tri Displays, Inc., supra; Modern Carpet Industries, Inc.,* 236 NLRB 1014 (1977), enfd. 611 F.2d 811 (10th Cir.1979); *Pen Pekin Corporation,* 181 NLRB 1025 (1970), enfd. 452 F.2d 205 (7th Cir.1970).

"Nor does the fact that employees fail to make a specific demand to the employer automatically render their conduct unprotected. Particularly where the employees are not represented by a labor organization which may speak to the employer on their behalf, 'if from surrounding circumstances the employer should reasonably see that improvement of working conditions is behind the walkoff, it may not penalize the employees involved without running afoul of Section 8(a)(1),' *South Central Timber Development, Inc.,* 230 NLRB 468, 472 (1977); *N.L.R.B. v. Washington Aluminum, supra.*

"Applying these principles to the instant case, we find that the 11 employees who clocked out to protest the presence of ammonia fumes in their work environment were clearly engaged in protected concerted activity. The presence of ammonia fumes in the work environment is, obviously, a working condition. The uncontested testimony of these employees demonstrates that their walkout was caused by concern over these fumes and their desire to see that 'something might be done about it.' The record in this case permits no doubt that their concerns were made known to Respondent. The Administrative Law Judge was seemingly of the view that the employees were not entitled to leave the plant because such action was in derogation of an existing plant rule and because Respondent had provided a procedure which adequately dealt with the problem. We disagree.

"Of particular significance here is the fact that Respondent's employees are not represented by a labor organization or covered by a collective-bargaining agreement containing a 'no-strike' clause. The fact that Respondent has unilaterally established and promulgated a rule restricting this activity is insufficient to deprive employees of a statutory right. Nor can it be said that because Respondent has provided an alternative solution to the problem, the employees are required to accept it. No matter how reasonable the alternative might seem, if the employees choose to exercise their statutory rights, they can not be penalized for doing so.

"We must also reject the Administrative Law Judge's conclusion that the employees' walkout was unprotected because the Occupational Safety and Health Administration found Respondent's plant not to violate its regulations, or because another statutory scheme might have afforded the employees some form of relief. The rights guaranteed to employees under the National Labor Relations Act are distinct from and are not subordinate to the provisions of the Occupational Safety and Health Act, *Du-Tri Displays, supra.* To hold otherwise might seriously diminish the rights of employees to engage in concerted activity for their mutual aid and protection and would constitute an abdication of the role that Congress has assigned to the National Labor Relations Board in protecting those rights.

"Accordingly, for the reasons stated above, we find that Respondent violated Section 8(a)(1) of the Act by discharging the 11 employees because they engaged in a strike over working conditions. We also find that Plant Manager A.J. Schopp's statement to employees that 'If you clock out and go home today, don't come back tomorrow ... consider yourself fired,' was a threat of discharge for engaging in protected activity and therefore in violation of Section 8(a)(1) of the Act.[3] [3 See *Vic Tanney International,* 232 NLRB 353 (1977), enfd. 622 F.2d 237 (6th Cir.1980).]

"Lastly, we agree with the General Counsel that the 11 discharged employees are entitled to full and immediate reinstatement and backpay. Employees who are unlawfully discharged while engaged in a

lawful strike are entitled to backpay from the date of the discharge until the date that they are offered reinstatement. *Abilities and Goodwill, Inc.*, 241 NLRB 27 (1979), enforcement denied on other grounds, 612 F.2d 6 (1st Cir.1979). The Administrative Law Judge noted that the 11 discharged employees did not request reinstatement. However, under our current decisions, there is no requirement that employees who are unlawfully discharged during a protected strike must request reinstatement; 'since it is the employer who has acted unlawfully in discharging the employee, the burden is on that employer to undo its unfair labor practice by offering immediate reinstatement to the employee, and by reimbursing the employee for all losses suffered from the date of its discriminatory action,' *Abilities and Goodwill, Inc., supra.*

### The Remedy

"Having found that Respondent has engaged in unfair labor practices within the meaning of Section 8(a)(1) of the Act, we shall order that it cease and desist therefrom and that it take certain affirmative action designed to effectuate the policies of the Act.

"Having found that on September 11, 1980, Respondent unlawfully threatened its employees with discharge for engaging in a lawful strike, we shall order that it cease and desist from such unlawful conduct.

"Having found that, on September 11, 1980, Respondent unlawfully discharged 11 of its employees [4] [[4] The 11 unlawfully discharged employees are: Susan Awe, Naomi Best, Margaret Bressie, Mary Briscoe, Karen Harding, Joyce Himmelsbach, Betty Leyerle, Georgia Lourance, Sharon Peine, Sharon Teuton, and Anna Travis.] for engaging in a lawful strike over working conditions and has thereafter refused and failed to offer these employees full and immediate reinstatement, we shall order that it cease and desist from such unlawful conduct and offer the 11 unlawfully discharged employees full and immediate reinstatement to their jobs or, if such positions no longer exist, to substantially equivalent positions, without prejudice to their seniori-

ty or other rights and privileges. We shall also order that Respondent make whole these 11 employees for any loss of pay they may have suffered because of Respondent's unlawful discharge, by payment to them of a sum equal to that which they would have earned from the date of their discharge until they are reinstated or receive valid offers of reinstatement, less any net interim earnings. Backpay shall be computed in accordance with the formula set forth in *F.W. Woolworth Company*, 90 NLRB 289 (1950), with interest thereon to be computed in the manner prescribed in *Florida Steel Corporation*, 231 NLRB 651 (1977) [5] [[5] See, generally, *Isis Plumbing & Heating Co.*, 138 NLRB 717 (1962). In accordance with his dissent in *Olympic Medical Corporation*, 250 NLRB 146 (1980), Member Jenkins would award interest on the backpay due based on the formula set forth therein.]"

Here followed the conclusions of law and order of the NLRB in detail.

### Contentions of Respondent Tamara

Tamara in its Cross Petition for Review of the Decision and Order of the NLRB and in its Opening Brief in this Court makes the following contentions:

A. The conduct resulting in the disciplinary action on September 11, 1980, did not constitute "protected concerted activity."

B. The NLRB erred in refusing to defer or to accommodate the provisions of the Occupational Safety and Health Act (OSHA), promulgated OSHA standards, and the standards of the LMRA (Labor Management Relations Act).

C. The remedial order of the NLRB is contrary to law.

D. The finding of the NLRB of a violation of Section 8(a)(1) is contrary to law.

### Decision Granting Application For Enforcement of Order of NLRB

After considering the briefs, arguments and the record, including the transcript of the hearing before the ALJ, we conclude that the application of the NLRB for an

order enforcing its Decision and Order, quoted above, shall be granted.

*Jurisdiction*

This Court has jurisdiction of the issues under Section 10(e) of the Act, 29 U.S.C. § 160(e), because the alleged unfair practices occurred in Missouri.

*Discussion of Contentions of Respondent*

**A.**

Tamara first contends that the NLRB erred in concluding from the uncontroverted facts that the walkout of the eleven employees was concerted activity (or strike) protected by Section 7 of the Act, 29 U.S.C. § 157. Tamara contends in detail that this conclusion of the NLRB is based on an erroneous "subjective standard" to determine whether an "employee safety" protest is protected, rather than whether the "protest" activity was directed to "actual or objectively perceived danger" in the workplace. Further, Tamara argues that Section 7 protection of "safety protest" matters is limited to circumstances, said to be absent in this case, in which the protesting employees had no other alternative but to perform work perceived to be dangerous, or under conditions perceived to be dangerous.

Next Tamara contends that the NLRB erred in failing to balance and accommodate the employees' rights of protest against the claimed superior legitimate interests of Tamara to conduct business with loyalty of the employees, and without harassment or other disruptive conduct.

These contentions and arguments are lacking in merit under the controlling decisions of the Supreme Court of the United States in *National Labor Relations Board v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), and of this Court in *First National Bank of Omaha v. National Labor Relations Board* (C.A.8 1969) 413 F.2d 921. The following quotations from the opinion of the Supreme Court of the United States in *National Labor Relations Board v. Washington Aluminum Co., supra,* demonstrate that the NLRB did not err in concluding that the

walkout of the eleven employees of Tamara was concerted activity protected under Section 7 of the Act unless forbidden by other lawful prohibitions of the Occupational Safety and Health Act or of the Labor Management Relations Act:

> The Court of Appeals . . . refused to enforce an order of the [NLRB] directing respondent . . . to reinstate and make whole seven employees whom the company had discharged for leaving their work in the machine shop without permission on claims that the shop was too cold to work in.

> \*    \*    \*    \*    \*    \*

> We cannot agree that employees necessarily lose their right to engage in concerted activities under § 7 merely because they do not present a specific demand upon their employer to remedy a condition they find objectionable. The language of § 7 is broad enough to protect concerted activities whether they take place before, after, or at the same time such a demand is made. To compel the Board to interpret and apply that language in the restricted fashion suggested by the respondent here would only tend to frustrate the policy of the Act to protect the right of workers to act together to better their working conditions. Indeed, as indicated by this very case, such an interpretation of § 7 might place burdens on employees so great that it would effectively nullify the right to engage in concerted activities which that section protects. The seven employees here were part of a small group of employees who were wholly unorganized. They had no bargaining representative and, in fact no representative of any kind to present their grievances to their employer. Under these circumstances, they had to speak for themselves as best they could. As pointed out above, prior to the day they left the shop, several of them had repeatedly complained to company officials about the cold working conditions in the shop.

> \*    \*    \*    \*    \*    \*

Although the company contends to the contrary, we think that the walkout involved here did grow out of a "labor dispute" within the plain meaning of the definition of that term in § 2(9) of the Act which declares that it includes "any controversy concerning terms, tenure or *conditions of employment....*" The findings of the Board ... show a running dispute between the machine shop employees and the company over the heating of the shop on cold days—a dispute which culminated in the decision of the employees to act concertedly in an effort to force the company to improve that condition of their employment. The fact that the company was already making every effort to repair the furnace and bring heat into the shop that morning does not change the nature of the controversy that caused the walkout. At the very most, that fact might tend to indicate that the conduct of the men in leaving was unnecessary and unwise, and it has been long settled that the reasonableness of the workers' decision to engage in concerted activity is irrelevant to the determination of whether a labor dispute exists or not....

    \*    \*    \*    \*    \*    \*

Nor can we accept the company's contention that because it admittedly had an established plant rule which forbade employees to leave their work without permission of the foreman, there was justifiable "cause" for discharging these employees, wholly separate and apart from any concerted activities in which they engaged in protest against the poorly heated plant.

    \*    \*    \*    \*    \*    \*

It is of course true that § 7 does not protect all concerted activities, but that aspect of the section is not involved in this case. The activities engaged in here do not fall within the normal categories of unprotected concerted activities such as those that are unlawful, violent or in breach of contract. Nor can they be brought under this Court's more recent pronouncement which denied the protec- tion of § 7 to activities characterized as "indefensible" because they were found to show a disloyalty to the workers' employer which this Court deemed unnecessary to carry on the workers' legitimate concerted activities. The activities of these seven employees cannot be classified as "indefensible" by any recognized standard of conduct. Indeed, concerted activities by employees for the purpose of trying to protect themselves from working conditions as uncomfortable as the testimony and Board findings showed them to be in this case are unquestionably activities to correct conditions which modern labor-management legislation treats as too bad to have to be tolerated in a humane and civilized society like ours.

The striking similarities of the facts in the *Washington Aluminum Co.* case, *supra,* and in this case make it clear that the NLRB did not err in concluding that the walkout in this case was concerted activity protected by Section 7 of the Act.

An opinion by Judge Heaney, for this Court, following the *Washington Aluminum Co.* case, *supra,* emphasizes the importance of considering the lack of representation of the employees, as in this case, by a labor organization and the absence of a collective bargaining agreement. *First National Bank of Omaha v. National Labor Relations Board* (C.A.8 1969) 413 F.2d 921 at 926.

The many authorities relied on by Tamara in support of the foregoing contentions are either not in point or distinguishable.

We examine next the contentions of Tamara concerning the Occupational Safety and Health Act (OSH Act) and the Labor Management Relations Act (LMRA).

### B.

Tamara further contends that the NLRB erred in ignoring (1) the provisions and standards of the OSH Act, 29 U.S.C. §§ 651 *et seq.,* and (2) Section 502 of the LMRA, 29 U.S.C. § 143. These contentions will be discussed separately.

### 1. *The OSH Act and Standards*

Tamara complains of the failure of the NLRB to cite and apply the OSH Act and standards promulgated thereunder, 29 C.F.R. §§ 1910.1000(a)(2) and 1977.12, as prohibiting the action of the eleven employees in walking off the job, particularly in the absence of a reasonable apprehension of death or serious injury by objective evidence, and in the absence of no choice other than a refusal to work while exposed to death or serious injury. This complaint of Tamara is without merit under the controlling decision of *Whirlpool Corporation v. Marshall*, 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980). In denying contentions similar to those of Tamara, the Supreme Court of the United States said (445 U.S. 1 at 8–11, 100 S.Ct. 883 at 888–890, 63 L.Ed.2d 154 at 161–163):

> The Act itself creates an express mechanism for protecting workers from employment conditions believed to pose an emergent threat of death or serious injury. Upon receipt of an employee inspection request stating reasonable grounds to believe that an imminent danger is present in a workplace, OSHA must conduct an inspection. 29 U.S.C. § 657(f)(1). In the event this inspection reveals workplace conditions or practices that "could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures otherwise provided by" the Act, 29 U.S.C. § 662(a), the OSHA inspector must inform the affected employees and the employer of the danger and notify them that he is recommending to the Secretary that injunctive relief be sought. § 662(c). At this juncture, the Secretary can petition a federal court to restrain the conditions or practices giving rise to the imminent danger. By means of a temporary restraining order or preliminary injunction, the court may then require the employer to avoid, correct, or remove the danger or to prohibit employees from working in the area. § 662(a).

> To ensure that this process functions effectively, the Act expressly accords to every employee several rights, the exercise of which may not subject him to discharge or discrimination. An employee is given the right to inform OSHA of an imminently dangerous workplace condition or practice and request that OSHA inspect that condition or practice. 29 U.S.C. § 657(f)(1). He is given a limited right to assist the OSHA inspector in inspecting the workplace, §§ 657(a)(2), (e), and (f)(2), and the right to aid a court in determining whether or not a risk of imminent danger in fact exists. See § 660(c)(1). Finally, an affected employee is given the right to bring an action to compel the Secretary to seek injunctive relief if he believes the Secretary has wrongfully declined to do so. § 662(d).

> In the light of this detailed statutory scheme, the Secretary is obviously correct when he acknowledges in his regulation that, "as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace." By providing for prompt notice to the employer of an inspector's intention to seek an injunction against an imminently dangerous condition, the legislation obviously contemplates that the employer will normally respond by voluntarily and speedily eliminating the danger. And in the few instances where this does not occur, the legislative provisions authorizing prompt judicial action are designed to give employees full protection in most situations from the risk of injury or death resulting from an imminently dangerous condition at the worksite.

> As this case illustrates, however, circumstances may sometimes exist in which the employee justifiably believes that the express statutory arrangement does not sufficiently protect him from death or serious injury. Such circumstances will probably not often occur, but such a situation may arise when (1) the employee is ordered by his employer to work under conditions that the employee reasonably believes pose an imminent risk of death or serious bodily injury, and (2) the em-

ployee has reason to believe that there is not sufficient time or opportunity either to seek effective redress from his employer or to apprise OSHA of the danger.

Nothing in the Act suggests that those few employees who have to face this dilemma must rely exclusively on the remedies expressly set forth in the Act at the risk of their own safety. But nothing in the Act explicitly provides otherwise. Against this background of legislative silence, the Secretary has exercised his rulemaking power under 29 U.S.C. § 657(g)(2), and has determined that, when an employee in good faith finds himself in such a predicament, he may refuse to expose himself to the dangerous condition, without being subjected to "subsequent discrimination" by the employer. (Footnotes omitted.)

The regulation, 29 C.F.R. § 1977.12, providing this right to employees in paragraph (b)(2) is quoted in full in footnote 3 of *Whirlpool Corporation v. Marshall, supra.* The regulation, and particularly the protection it affords employees who in good faith and with reasonable apprehension of death or serious bodily injury refuse to expose themselves to dangerous conditions, were found to be valid.

■ We conclude that the NLRB was not required to deny relief because of the existence of the OSH Act. The employees had sought relief in 1979 and in July, August and September 1980 under the OSH Act without relief from the conditions that continued repeatedly until the walkout. Thus the NLRB properly affirmed the findings of these facts of the ALJ. The NLRB also found that the ammonia fumes caused the employees to experience nausea, burning sensations in their noses, headaches, tightness in their chests and difficulty in breathing. These symptoms and the apprehension of injury were reasonable and objectively proven in light of the commonly known effects of exposure to ammonia. See part of the description of ammonia in *The New Columbia Encyclopedia* (Columbia University Press 1975) at page 92 as follows:

*ammonia,* chemical compound, $NH_3$, colorless gas that is about one half as dense as air at ordinary temperatures and pressures. It has a characteristic pungent, penetrating odor. It is extremely soluble in water; one volume of water dissolves about 1,200 volumes of the gas at $0°C$ (90 grams of ammonia in 100 cc of water), but only about 700 volumes at room temperature and still less at higher temperatures. The solution is alkaline because much of the dissolved ammonia reacts with water, $H_2O$, to form ammonium hydroxide, $NH_4OH$, a weak base. The ammonia sold for household use is a dilute water solution of ammonia in which ammonium hydroxide is the active cleansing agent. It should be used with caution since it can attack the skin and eyes. The vapors are especially irritating—prolonged exposure and inhalation cause serious injury and may be fatal.

The OSH Act is not designed to provide relief in these urgent circumstances. See the sometimes protracted deliberate proceedings possible under the unusual procedures of the OSH Act, described in *Donovan, Secretary of Labor v. Anheuser-Busch, Inc.* (C.A.8 1981) 666 F.2d 315 at 323–324.

The NLRB did not err in concluding that the rights guaranteed to these employees by the Act are superior to the provisions of the OSH Act.

Nor does the failure of the employees to expressly demand specific corrective action affect the rights of these unorganized employees. As the NLRB found, the repeated complaints of the employees under the OSH Act and the experiences on the day of the walkout made evident the desires of the employees for action by Tamara.

2. *Section 502 of the LMRA*

Tamara argues that under Section 502 of the LMRA, 29 U.S.C. § 143, "objective evidence" and "good faith belief" of "abnormally dangerous conditions of work" are required to support a finding of activity protected by Section 7 of the Act; and that this was not considered by the NLRB in this action. To the extent required by Section 502, the facts found by the NLRB and the

ALJ were supported by objective evidence, and good faith belief was proven.

Section 502 (29 U.S.C. § 143) is as follows:

*Saving provision*

Nothing in this Act shall be construed to require an individual employee to render labor or service without his consent, nor shall anything in this Act be construed to make the quitting of his labor by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service, without his consent; nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this Act [LMRA].

■ This provision does not modify Section 7 of the Act and is not relevant to the action of the NLRB in this case. The purpose of Section 502 was described, by the Supreme Court of the United States, in footnote 29 of *Whirlpool Corporation v. Marshall, supra,* as follows:

Similarly, Section 502 of the Labor Management Relations Act, 29 U.S.C. § 143 provides that "the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees [shall not] be deemed a strike." The effect of this section is to create an exception to a no-strike obligation in a collective-bargaining agreement. *Gateway Coal Co. v. Mine Workers,* 414 U.S. 368, 385, 38 L.Ed.2d 583, 94 S.Ct. 629 [640].

The existence of these statutory rights also makes clear that the Secretary's regulation [29 C.F.R. § 1977.12(b)(1)] does not conflict with the general pattern of federal labor legislation in the area of occupational safety and health. See also 29 C.F.R. § 1977.18 (1979).

There was no collective bargaining agreement in this case, to make Section 502 applicable.

C.

*Remaining Contentions of Tamara*

Except for the complaint about the remedy, the remaining contentions of Tamara that the NLRB erred in its Decision and Order are determined to be lacking in merit by disposition of its primary contentions A and B above.

■ The remedy of the NLRB requiring reinstatement of the employees and awarding back pay was authorized, although the employees did not request reinstatement or offer to return to work. *Abilities and Goodwill, Inc.,* 241 NLRB, No. 5, 27 (1979), reversed on other grounds (C.A.1 1979) 612 F.2d 6; *National Labor Relations Board v. Lyon & Ryan Ford, Inc.* (C.A.7 1981) 647 F.2d 745 at 755–757, *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209; *National Labor Relations Board v. Mars Sales & Equipment Co.* (C.A.7 1980) 626 F.2d 567 at 573–575; *National Labor Relations Board v. Trident Seafoods Corp.* (C.A.9 1981) 642 F.2d 1148 at 1149–1150.

*Conclusion*

For the foregoing reasons the application of the NLRB for enforcement of its Decision and Order is hereby,

GRANTED.