[No. 51529-8. En Banc. August 22, 1985.]

NOEL BALLINGER, ET AL, *Respondents,* v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Petitioner.*

324

*Kenneth O. Eikenberry, Attorney General,* and *Kathleen D. Mix, Assistant,* for appellant.

*Swanson, Parr, Cordes, Younglove, Peeples & Wyckoff, P.S.,* and *Clifford F. Cordes III,* for respondent Ballinger, et al.

*Gaither M. Kodis* of *Law and Justice Professional Legal Services, Inc., P.S.,* for respondent Grainger.

DOLLIVER, C.J.—On discretionary review, the Department of Social and Health Services (DSHS) challenged the reversal by the trial court of a decision of the State Personnel Board. After a lengthy hearing,. the Board affirmed the dismissal of 27 correctional officers at the Washington State Penitentiary in Walla Walla who had refused to take their posts on the grounds the conditions at the penitentiary were abnormally unsafe. Accelerated review was granted. We reverse the trial court and reinstate the decision of the Board.

I

In August 1978, there was a change of administration at Walla Walla. This followed a several–year period during which there had been escapes, explosions, stabbings, and other violent incidents. During this time, eight inmates and a correctional officer were killed. The strategy of the new administration to end the violence included breaking up the numerous inmate clubs, tightening up inmate freedom, and improving the penitentiary infrastructure. Walla Walla was seriously overcrowded during the period in question; the prison housed approximately 1,400 prisoners in a facility designed for approximately 900. On June 15, 1979, a correctional sergeant was killed by some prisoners. The prison immediately went into a "lock down", a period during which prisoners were confined to their cells. The lock down remained in effect for the next several months. A "shake down" was then conducted to recover weapons in the possession of the prisoners and confiscate other impermissible possessions. These corrective measures fueled inmate violence.

On July 7 and 8, while the prison was on lock down, riots broke out in the "Eight Wing" and several prisoners looted their cells. The riots caused severe damage and the inmates were moved into the "Big Yard" to allow for repairs. The

prison administration called in the National Guard and approximately 120 State Patrol officers. While the record does not state the exact commencement date, during the lock down the prison administration began to plan and implement measures to correct recognized problems. These measures included the installation of metal detectors, increased patdowns, and stricter inmate control. In addition, certain "park" areas within the prison walls were paved over and the construction of metal cages for correctional officers was initiated.

On or about July 13, 1979, the union membership presented management with a list of 34 proposals. Management responded to this list on July 18, 1979. Many of the prison's deficiencies were noted in a report issued by the American Correctional Association on July 23, 1979. This report, which noted the conditions in the prison were "intolerable", contained 116 recommendations. Neither plaintiffs nor their union filed a complaint under RCW 49.17, the Washington Industrial Safety and Health Act of 1973 (WISHA).

On July 29 and 30, 1979, plaintiffs arrived at work but refused to take their posts. Plaintiffs' refusal to work was not officially endorsed by their union. Plaintiffs asserted a number of complaints including numerous inexperienced officers resulting from high turnover, double shifts, ineffective allocation of manpower, the low officer/inmate ratio when prisoners were being escorted from their cells to other areas of the prison, insufficient lighting, strength of cages, danger of being hit by flying objects thrown from prison cells, and lack of communication with management. In addition, plaintiff Coy Grainger asserted he had vital medical reasons which excused him from performing the work to which he was assigned. Plaintiffs were terminated on the spot and ordered to leave the institution. Termination letters were not issued at the time but were mailed, via certified mail, on July 30, 1979.

The Board affirmed the termination stating that (1) conditions at the penitentiary were not significantly less safe

on July 29 and it was not reasonable for plaintiffs to refuse to report to work, (2) plaintiffs failed to exhaust their statutory and contractual remedies, and (3) the refusal to report to work constituted neglect of duty and insubordination.

The Superior Court reversed. The court found (1) Walla Walla was an "emergency situation" which required emergency financing and emergency protection measures; (2) it was unnecessary for plaintiffs to file a complaint with the Department of Labor and Industries pursuant to RCW 49.17; (3) the Board "decided the case contrary to a preponderance of the evidence as disclosed by the entire record in violation of RCW 34.04.130"; (4) the danger was so great on July 29 and 30 that "the guards were walking into a near certainty of physical injury or death when they reported to work" and that DSHS "failed to provide [the correctional officers] a safe place . . . to work"; and (5) the State "has not proved by a preponderance of the evidence that the actions of the [correctional officers] constituted insubordination and neglect of duty." The trial court ordered plaintiffs reinstated as of July 29 and 30, 1979, with full back pay and benefits.

DSHS asked for discretionary review and received a stay of the trial court's order. RAP 8.3. Pursuant to RAP 18.8(a) and RAP 18.12, the Court of Appeals, Division Two, granted accelerated review and certified the case to this court. RCW 2.06.030.

Four issues are before the court:

1. Whether the trial court erred when it applied a "preponderance of the evidence" standard and conducted de novo review of the decision of the State Personnel Board.

2. Whether the trial court erred in concluding the refusal of plaintiffs to work on July 29 and 30 was justified on the grounds that conditions at Walla Walla were abnormally dangerous.

3. Whether the trial court erred in concluding plaintiffs were not required to exhaust their administrative remedies under RCW 49.17 as a condition precedent to their refusal

to work.

4. Whether, under WAC 356–34–040(2), notice of termination may be served by certified mail when an employee insubordinately refuses to work on a regularly scheduled workday.

## II

The trial court ruled the decision of the Personnel Board was "contrary to a preponderance of the evidence as disclosed by the entire record in violation of RCW 34.04.130." We initially note that RCW 34.04.130, the administrative procedure act, does not apply per se to decisions of the Personnel Board since the Personnel Board statute, RCW 41.64.130, contains its own standard of review. *See Muije v. Department of Social & Health Servs.,* 97 Wn.2d 451, 453, 645 P.2d 1086 (1982).

In *Gogerty v. Department of Insts.,* 71 Wn.2d 1, 8–9, 426 P.2d 476 (1967), we held that superior courts reviewing decisions of the Personnel Board must accord the administrative decision a presumption of correctness despite the fact that the Personnel Board statute sets forth a preponderance of the evidence test. The test, referred to as the substantial evidence test, is whether

> there exists therein any competent, relevant and substantive evidence which, if accepted as true, would, within the bounds of reason, directly or circumstantially support the challenged finding or findings.

*Gogerty,* at 8–9. *Gogerty* specifically rejected an interpretation of the statute which would "confer upon the superior court de novo reviewing powers over personnel board findings of fact made and entered pursuant to the provisions of [the statute]." *Gogerty,* at 7–8. The court stated

> that before the superior court could upset the board's findings it would have to demonstrably appear, from the record as a whole, that the quantum of competent and supportive evidence upon which the personnel board predicated a challenged finding or findings of fact was so meager and lacking in probative worth, and the opposing evidence so overwhelming, as to dictate the conclusion

that the pertinent finding or findings did not rest upon any sound or significant evidentiary basis.

*Gogerty,* at 8.

We are not presented with, nor do we find, reason to depart from the standard of review set forth in *Gogerty.* Although the Personnel Board statute which *Gogerty* interpreted (RCW 41.06.200(1)) was repealed, its successor, RCW 41.64.130, contains substantially identical language. Moreover, we presume the 1981 Legislature in passing RCW 41.64.130 was aware of our interpretation in *Gogerty* of the Personnel Board appeals statute and chose not to modify it. *See Glass v. Stahl Specialty Co.,* 97 Wn.2d 880, 887–88, 652 P.2d 948 (1982) (citing *Bixler v. Bowman,* 94 Wn.2d 146, 149, 614 P.2d 1290 (1980)).

The trial court erred in conducting de novo review of the entire record under the preponderance of the evidence standard.

## III

Before considering whether there was substantial evidence to support the conclusions of the Personnel Board, we first identify what right the plaintiffs would have had not to work. In *Lowry v. Board of Indus. Ins. Appeals,* 102 Wn.2d 58, 684 P.2d 678 (1984), we affirmed the principle that an employee may disobey the orders of a superior if the employee reasonably believed adherence to the order would constitute a violation of law. While *Lowry* did not require us to discuss the issue further, we noted that this principle applies to orders which would be unsafe. *Lowry,* at 62 (citing *Ashman v. Children's Servs. Div.,* 37 Or. App. 865, 873, 588 P.2d 665 (1978)).

WISHA provides that every employer shall provide a place of employment free from recognized hazards that are causing or likely to cause serious injury or death. RCW 49.17.060(1). WAC 296–360–150, moreover, provides that workers may refuse to work if they face a real danger of death or serious injury.

The right not to work principle is also well developed in

federal labor law. *See generally* Note, *Refusal of Hazardous Work Assignments: A Proposal for a Uniform Standard,* 81 Colum. L. Rev. 544 (1981). Interpreting section 8(a)(1) of the National Labor Relations Act, the United States Supreme Court has held that, so long as an employee who was engaged in a "concerted activity" was acting in good faith, the employee had a right not to work due to health or safety conditions regardless of whether the employee's action was reasonable. *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 8 L. Ed. 2d 298, 82 S. Ct. 1099 (1962). Twelve years later, the Court interpreted section 502 of the Labor Management Relations Act and held an employee must first prove there was ascertainable objective evidence supporting the workers' conclusion that an abnormally dangerous work condition exists. *Gateway Coal Co. v. United Mine Workers of Am.,* 414 U.S. 368, 38 L. Ed. 2d 583, 94 S. Ct. 629 (1974). Cases following *Gateway Coal* generally have held the danger must be imminent, abnormal, and there must be no time to seek relief through proper channels. *See, e.g., NLRB v. Tamara Foods, Inc.,* 692 F.2d 1171, 1181–82 (8th Cir. 1982). The assumption underlying the requirement the occupational hazard be imminently abnormal is that the "usual dangers" inherent in an occupation have been bargained for and are reflected in the employee's salary. Note, 81 Colum. L. Rev. at 557.

The scope of the right not to work is best summed up in *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 4 n.3, 63 L. Ed. 2d 154, 100 S. Ct. 883 (1980) (quoting 29 C.F.R. § 1977.12 (1979)) in which the Court upheld, under section 11(c)(1) of the federal Occupational Safety and Health Act of 1970 (OSHA) statutes, administrative regulations which provided that

occasions might arise when an employee is confronted with a choice between not performing assigned tasks or subjecting himself to serious injury or death arising from a hazardous condition at the workplace. If the employee, with no reasonable alternative, refuses in good faith to expose himself to the dangerous condition, he would be

protected against subsequent discrimination. The condition causing the employee's apprehension of death or injury must be of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a real danger of death or serious injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels. In addition, in such circumstances, the employee, where possible, must also have sought from his employer, and been unable to obtain, a correction of the dangerous condition.

*See also Marshall v. N.L. Indus., Inc.*, 618 F.2d 1220 (7th Cir. 1980) (danger of immediate explosion); *Wheeling–Pittsburgh Steel Corp. v. NLRB*, 618 F.2d 1009 (3d Cir. 1980) (unsafe crane); *NLRB v. Tamara Foods, Inc.*, 692 F.2d 1171 (8th Cir. 1982) (ammonia fumes).

Is there substantial evidence in the record supporting the conclusion of the Personnel Board that the conditions at Walla Walla were such that it was unreasonable for plaintiffs to refuse to work? *See Smith v. Skagit Cy.*, 75 Wn.2d 715, 718, 453 P.2d 832 (1969) (appellate court reviews administrative record in same capacity as trial court since trial court did not conduct hearings). While the record may reflect that Walla Walla was a dangerous place in the spring and summer of 1979, it also shows the following facts which existed at the time of the walkout. The prisoners were confined to their cells. The entire institution had been "shaken down". Management maintained a 2–to–1 officer/ inmate escort ratio during the shake–down period. Some architectural changes were underway to eliminate "blind spots" on escort routes and other changes in the Big Yard. Security cages were erected in early July and were subject to the union's approval for safety. Guards were posted to prevent prisoners from gaining access to tools and other potential weapons at construction sites. Video cameras were installed to monitor prisoner escorts. Finally, the prison was taking additional steps to protect the escorting officers such as calling in the National Guard and over 100 State

Patrol officers. The record also reflects that, during the weeks preceding the walkout, prison administration maintained negotiations with representatives of the union and union leaders had complete access to management personnel.

While the extensive record is replete with evidence the prison may have been operated more safely and additional resources should have been allocated, the evidence of "abnormal" danger is conflicting and confusing. Under these facts, the decision of the administrative agency, which conducted extensive hearings, should be accorded substantial weight. There simply was no overwhelming evidence demonstrating there was an imminent risk of serious bodily injury. As the National Labor Relations Board has noted:

> [W]ork which is recognized and accepted by employees as inherently dangerous does not become "abnormally dangerous" merely because employee patience with prevailing conditions wears thin or their forbearance ceases.

*Anaconda Aluminum Co.*, 197 N.L.R.B. 336, 344 (1972).

Plaintiff Coy Grainger argues his refusal to work on July 29, 1979, was justified due to his unique medical disabilities. The Board, however, found his disabilities did not distinguish him from the other plaintiffs. In its memorandum opinion, the trial court held only that "[Grainger's] disability was a factor which simply made his a stronger case."

Our review of plaintiff Grainger's testimony before the Personnel Board fails to disclose any significant evidence that his case should be treated differently. Grainger's medical disabilities primarily prevented him from having contact with the inmates. Nevertheless, prior to the walkout, and without objection, Grainger apparently had been working 2 days a week in the admissions department, a place in which there was a possibility of inmate contact. Since, at the time of the walkout, Grainger was not asked to perform any duties, other than the admissions department, which presented the possibility of contact with the inmates, we see little evidence demonstrating conditions were any more unsafe for plaintiff Grainger than his coplaintiffs.

As to all plaintiffs, there was substantial evidence supporting the Board's decision that conditions at Walla Walla were not abnormally unsafe.

## IV

Even assuming plaintiffs' fears of abnormal and imminent danger were not groundless, we find they had other alternatives to walking off the job. We disagree with the rejection by the trial court of the Personnel Board's ruling that plaintiffs should have exhausted their administrative remedies prior to walking off the job.

A refusal to work must be made in good faith. *Whirlpool Corp. v. Marshall, supra*; WAC 296–360–150-(3)(a). Implicit in the good faith determination is whether the employee has asked the employer to correct the hazard, WAC 296–360–150(4)(a), and whether there is insufficient time due to the urgency of the situation for the employee to exhaust available administrative remedies, WAC 296–360–150(3)(c).

While there may be occupational situations in which a danger is so imminent and unexpected that it would be futile to require workers to first exhaust administrative remedies prior to refusing to work, we find no evidence in this record which would indicate the industrial safety and health laws could not have offered plaintiffs the relief they were seeking. The grievances of the correctional officers in the present case began in the early spring of 1979; they did not crop up overnight. RCW 49.17.110–.130 enumerate elaborate emergency procedures pursuant to which employees may report violations of the state labor code. RCW 49.17.130 and .170, moreover, allow the Department of Labor and Industries to issue orders restraining dangerous conditions. The employer may not retaliate against employees for initiating these procedures. RCW 49.17-.160(1). Since many of the grievances were based on the physical infrastructure of the prison, WISHA appears to be directly applicable. *See* RCW 49.17.020(7) (WISHA broadly applies to all workplaces). Failure to exhaust these reme-

dies under the circumstances in this case is evidence of bad faith in staging the walkout.

As a matter of public policy, a worker whose presence is critical to maintain order should only as a last resort be entitled to refuse to work. The failure of the plaintiffs first to exhaust other available remedies is inconsistent with both state law and the sound operation of a critical public facility.

We furthermore note the refusal of individuals to perform a particular job where, as here, there is no "concerted activity", is not protected under the federal labor law. *McLean Trucking Co. v. NLRB*, 689 F.2d 605 (6th Cir. 1982); *Bay–Wood Indus., Inc. v. NLRB*, 666 F.2d 1011 (6th Cir. 1981). Since the union representing plaintiffs did not endorse the walkout nor did plaintiffs seek the union's assistance in filing a grievance under RCW 49.17, the unilateral action is particularly inappropriate. *See NLRB v. C & I Air Conditioning, Inc.*, 486 F.2d 977 (9th Cir. 1973).

## V

Plaintiffs were not personally served with a notice of termination at the time they were dismissed but were served by certified mail the following day. Thus, plaintiffs argue their notices of termination, issued pursuant to WAC 356–34–040, were defective. WAC 356–34–040 provides:

(1) Appointing authorities may dismiss a permanent employee for cause as specified in these rules. The employee shall be furnished with the specified charges in writing at least 15 calendar days prior to the effective date of the action.
(2) *The notification shall be furnished directly to the employee during working hours or if this is not possible because the employee works in a branch office or remote location or is absent on a regularly scheduled working day, mailed by certified letter to the employee's last known address.* A copy of the specified charges shall be submitted to the personnel appeals board at the same time.

(Italics ours.) Specifically, plaintiffs assert that, since they were on the job on the day of the walkout, *e.g.*, "during

working hours", they should have been served personally with their notices of termination at that time. Plaintiffs additionally assert personal service was necessary since they were not "absent on a regularly scheduled working day."

In support, plaintiffs cite the Personnel Board cases of Stewart v. Department of Social and Health Services, SPB 79 S 38 (1979) and Johnson v. Spokane Community College District 17, HEPB 1064 (1980). These cases are readily distinguishable since none of them involve situations in which an employee insubordinately refused to work *on* a regularly scheduled workday. In Stewart, for example, the state employee telephoned in sick on a regularly scheduled working day. Notice of termination was mailed the next day, which happened to be his regularly scheduled day off. Since the employee was "sick" on a regularly scheduled working day, he was not "absent" on a regularly scheduled working day for purposes of service of process because his absence was excused by his reported illness and not occasioned by his insubordination. In the present case, plaintiffs appeared on the job but refused to work; unlike in Stewart, their absence from work could not have been excused.

In Johnson, an employee was instructed to leave his work station on a regularly scheduled workday and was told to report to his supervisor the next day, which apparently was not a regularly scheduled workday. Johnson is distinguishable in that the employee could have been served on a regularly scheduled workday; in contrast, plaintiffs in the present case could not, as a practical matter, have been served on a regularly scheduled workday since it was not until that day that their employer knew they would be insubordinate. Furthermore, Johnson is distinguishable in that the employee was personally served on his day off; in the present case, plaintiffs were not served personally while they were still employees; rather, their notices of termination were mailed to them after they were terminated.

 In asserting they should have been personally served with notice of termination at the time they walked

off the job, plaintiffs essentially argue their failure to take their posts did not make them "absent" for purposes of WAC 356–34–040. We do not subscribe to such an interpretation of the regulations. While WAC 356–34–040 apparently does not anticipate the situation in which an employee insubordinately refuses to work during regularly scheduled working hours, we find plaintiffs' construction of the termination laws illogical. WAC 356–34–040 reflects an administrative preference of providing personal notice of termination to an employee while the employee is at work. An employee who insubordinately refuses to work and who, as a result, is asked to leave the premises, becomes constructively "absent" for purposes of the notice of termination. Neither fairness nor common sense provides a compelling reason to interpret this regulation to require an employer to instruct an insubordinate employee to remain on the job while his or her notice of termination is being prepared. Since in the present case suspension proceedings followed and did not precede the insubordinate act of refusing to work, we hold that notice of termination was reasonable and consistent with the merit system rules. The Personnel Board's construction of its own rules is entitled to great weight. *State Liquor Control Bd. v. State Personnel Bd.*, 88 Wn.2d 368, 379, 561 P.2d 195 (1977).

Our interpretation of WAC 356–34–040 is supported by that regulation's regulatory counterparts. WAC 356–34–060, which sets forth procedures for "unauthorized absence" and "presumption of abandonment", provides that employees who are absent from their positions for 3 consecutive working days are presumed to have abandoned their positions and may be notified of their termination by certified mail. WAC 356–34–060 creates a "presumption" of abandonment; in the present case we have actual abandonment. WAC 356–34–060 therefore evinces a policy that workers who have abandoned their jobs may be served by certified mail. This confirms our conclusion that plaintiffs in the present case may be considered to have been "absent" from their jobs under WAC 356–34–040 and that notice by certi-

fied mail was reasonable. We adhere to this ruling despite the fact that plaintiffs apparently returned to the prison on the day the notice of termination was mailed.

Because we hold that plaintiffs' insubordinate act of refusing to work made them constructively "absent" from their jobs, we find no merit to plaintiffs' further contention that, as to plaintiffs Ballinger, Bell, Charlton, Kalan, Nelson, Owens, and R. Graham, they could not be served with notice of termination on their day off. When an employee is terminated by certified mail while he is constructively absent on a regular working day, that employee cannot, as a matter of common sense, possibly have a "day off" the next day. Furthermore, for the same reason, we reject the contention of plaintiffs Bryant and W. Graham that their notice was defective since it was received on the day in which they were to receive overtime.

## VI

In conclusion, we hold there was substantial evidence supporting the conclusion of the Personnel Board that conditions at Walla Walla were not abnormally or imminently dangerous so as to justify the refusal of plaintiffs to work. Our conclusion that the refusal to work was not justified is substantially supported by the fact that plaintiffs failed in good faith to exhaust their administrative remedies under the Washington Industrial Safety and Health Act of 1973, RCW 49.17. We furthermore conclude that the Personnel Board could have reasonably concluded that all of the plaintiffs received valid notice of termination. The decision of the trial court is reversed and the decision of the Personnel Board is reinstated as to all plaintiffs.

UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

Reconsideration denied October 22, 1985.