RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0226P (6th Cir.)
File Name: 02a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TNS, INC.,

Petitioner/
Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

Respondent/
Cross-Petitioner,

PAPER, ALLIED-INDUSTRIAL,
CHEMICAL & ENERGY
WORKERS INTERNATIONAL
UNION,

Intervenor.

Nos. 99-6379;
00-5433

On Petition for Review and Cross-Application for
Enforcement of an Order of
the National Labor Relations Board.
Nos. 10-CA-17709; 10-CA-18785.

Argued: September 21, 2001

Decided and Filed: July 10, 2002

Before:  KENNEDY, GUY, and BOGGS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** William M. Earnest, ELARBEE, THOMPSON & TRAPNELL, Atlanta, Georgia, for Petitioner.  Edward F. Hughes, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.  **ON BRIEF:** William M. Earnest, Robert L. Thompson, ELARBEE, THOMPSON & TRAPNELL, Atlanta, Georgia, for Petitioner.  Edward F. Hughes, Aileen A. Armstrong, Howard E. Perlstein, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.  Donald E. Jose, David Wiedis, Kristen B. Komer, JOSE & WIEDIS, West Chester, Pennsylvania, George H. Cohen, Laurence S. Gold, Jeremiah A. Collins, Robert Alexander, BREDHOFF & KAISER, Washington, D.C., for Intervenor.  Heather L. MacDougall, McGUINESS, NORRIS & WILLIAMS, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

_____

BOGGS, Circuit Judge.  This case is before the court upon the petition of TNS, Inc. ("TNS" or "the Company") to review, and the cross-application of the National Labor Relations Board ("NLRB" or "the Board") to enforce, an NLRB order finding that TNS breached obligations under Section 502 of the National Labor Relations Act ("NLRA") (29 U.S.C. § 143 (2002)) and ordering TNS to reinstate and pay back pay to employees affected by the Company's violation.  Section 502 protects employees who take job action due to "abnormally dangerous" working conditions at their place of employment.  In 1981, at the expiration of the collective bargaining agreement they had with the Company, employees at TNS's Jonesboro, Tennessee plant walked out,

claiming § 502 protection. When negotiations eventually failed, the Company hired permanent replacement workers; when the previous employees later sought reinstatement, the Company refused.

An infrequently used provision of the NLRA, the applicability, scope, and protections afforded to workers by § 502 are not facially clear. As a result, the Board, in the course of this case, has had to engage in several acts of statutory interpretation to clarify the meaning of § 502 before it could be applied to this set of facts. Having done so, the Board found that § 502 did apply to the 1981 job action and that TNS had violated § 502 by hiring permanent replacement workers and refusing to reinstate its previous employees.

On appeal, TNS makes several arguments in support of overturning the Board decision, including: (1) that the Board erred in interpreting § 502 to protect workers who were not prohibited from striking by either a statutory or contractual no-strike provision; (2) that the Board erred in interpreting § 502 to require only a good faith belief in dangerous conditions (supported by objective evidence) on the part of workers, as opposed to a more stringent requirement that abnormally dangerous conditions actually exist; (3) that the Board erred in interpreting § 502 to prohibit companies from permanently replacing workers who take job action pursuant to it; (4) that the Board erred in its factual determinations that the TNS employees believed in good faith that their working conditions were abnormally dangerous and that their belief was a contributing cause of the work stoppage; (5) that the Board erred in finding objective evidence of abnormal danger to exist in a plant regulated, monitored, and permitted to continue operation by the Nuclear Regulatory Commission and its state counterpart; and (6) that the Board inexcusably delayed the proceedings such that this court should not enforce its award.

TNS's arguments to this court can fairly be divided into three categories. The first three arguments are challenges to the Board's acts of statutory interpretation. The fourth and

fifth arguments are challenges to the Board's factual determinations. The final argument is an equitable one, asking this court to refuse to enforce the Board's award due to the Board's delay in this case. We reject TNS's statutory interpretation arguments because the Board's constructions of § 502 withstand the deferential review we are bound by Supreme Court precedent to give them. We reject in part and accept in part TNS's challenges to the Board's fact-finding. We also agree with TNS's inexcusable delay argument. Accordingly, we VACATE the Board's decision.

## I

TNS manufactures armor-piercing projectiles called "penetrators" at its plant in Jonesboro, Tennessee. The principal ingredient in penetrators is depleted uranium ("DU"), a radioactive substance with carcinogenic properties when inhaled or ingested over long periods of time. DU also may pose a toxic risk to the kidneys.

The Paper, Allied-Industrial, Chemical and Energy Workers Union (the "Union") represented the employees at TNS. During the relevant time, a joint management-labor health and safety committee undertook monthly inspections of the plant and reported various problems with the levels of DU dust to which employees were exposed and with the functioning of safety procedures and devices intended to keep DU exposure low. On March 10, 1981, allegedly in response to these problems and allegedly after the Company had failed to rectify them, the Union sent the following ultimatum to TNS:

> [E]mployees will not return to work after April 30 until the terms which are on the health and safety report have been corrected and [the Company] is safe and healthy for the employees to work. This includes the items from past inspections as well as items which will be listed during the April inspection.

On March 24, 1981, the Union and TNS commenced negotiations over a new collective bargaining agreement. Initially, TNS made an offer including a wage increase, an

under § 502, rather than remanding it for further consideration.

Company], or given the Board, or union, an unfair advantage.'" *NLRB v. Hub Plastics*, 52 F.3d 608, 614 (6th Cir. 1995) (quoting *NLRB v. Mich. Rubber Prods., Inc.*, 738 F.2d 111, 113 (6th Cir. 1984)); *see also NLRB v. Taylor Mach. Prods.*, 136 F.3d 507, 513-14 (6th Cir. 1998) (same). In the present case, TNS submits that it would be prejudiced by the Board's decision, in that the decision orders back pay and reinstatement. Since this case dragged on for 18 years between filing and the Board's second decision, the back pay that the Board ordered has potentially been mounting since then. Further, the Company alleges that its operations have so changed that ordering reinstatement of workers would be unrealistic.

In a case with a Board-ordered remedy similar to this one, the Second Circuit modified the Board's award of back pay and reinstatement because the case had dragged on for six years, during which time the back pay figure had mounted and the company had changed its internal structure to the extent that reinstatement was unrealistic. *See Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 189-90 (2d Cir. 1991).

The Board contends that there was no inexcusable delay, in that the case presented novel issues, produced a voluminous record and resulted in a lengthy 161-page decision by the ALJ, two comprehensive Board decisions, and a court of appeals remand, as well as time spent by the Board trying to reach a settlement between the parties. This is all true. However, the undisputed fact is that the case was filed with the Board in 1982. The Board's ALJ did not issue a decision until 1987. The Board did not issue its decision affirming the ALJ until 1992, more than five years later. After remand by the District of Columbia Circuit in 1995, the Board did not issue its second decision until September 1999, more than four years later. This court does not see a reasonable way to hold the Company responsible for damages accruing over all of this time, especially when its structure and business changed in the interim. Accordingly, we VACATE the Board's decision finding TNS to have breached its obligations

extended layoff period, an extended probationary period for new workers and retention of the Company's existing health and safety clause in the contract (protecting health concerns). The Union responded with a lengthy new health and safety clause, a proposal for new safety inspections, and objections to extending the layoff and probationary periods, among other things. There were eight more meetings before the contract expired on May 1, 1981. During these meetings, the Union claims it was concerned only with the safety issues, while TNS claims the Union fought over economic issues.

On May 1, 1981, TNS employees who were members of the Union began a work stoppage at the expiration of their collective bargaining agreement. The Union alleged that the work stoppage was not a strike as defined by the NLRA, because it fell under the §502 exemption for "quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees."[1]

On July 7, 1981, TNS notified the employees engaged in the work stoppage that it would hire permanent replacements on July 16, 1981. The employees did not relent. On February 15, 1982 the Union made an unconditional offer to return to work on behalf of the employees engaged in the work stoppage. However, TNS refused to reinstate the employees.

---

[1]Section 502 (29 U.S.C. § 143 (2002)) reads:

Saving provision
Nothing in this Act shall be construed to require an individual employee to render labor or service without his consent, nor shall anything in this Act be construed to make the quitting of his labor by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service, without his consent; nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this Act.

On August 18, 1982, the Union filed a complaint with the NLRB, alleging that TNS engaged in unfair labor practices by hiring permanent replacement workers to replace employees engaged in the work stoppage and then refusing to reinstate the Union employees after the Union made an unconditional offer to return to work. TNS filed a motion to dismiss the complaint, relying on the fact that the complaint alleged that the employees were engaged in a work stoppage because of the "good faith belief that their conditions for work at their place of employment were abnormally dangerous" rather than for the reason allegedly required by § 502, that the employees ceased work "in good faith because conditions for work at their place of employment were abnormally dangerous." In other words, the Union alleged *belief* that the conditions were dangerous rather than that the conditions *were* dangerous. Judge Schlesinger, an Administrative Law Judge ("ALJ") of the NLRB, granted a motion to amend the complaint on August 11, 1983, and the Union changed its allegation accordingly. On August 18, 1983, TNS filed with the NLRB a request to appeal the granting of the motion to amend, which the NLRB rejected.

After the appeal, another ALJ (Judge Schlesinger was recused) undertook a hearing *de novo*, as per the NLRB order, and found TNS liable for violating § 502's requirements in an opinion dated July 31, 1987. More than five years later, on December 23, 1992, the Board issued a Supplemental Decision and Order wherein three out of four Board members voted to reverse the ALJ, dismissing all unfair labor allegations. *See TNS, Inc. and Oil, Chem. and Atomic Workers Int'l Union*, 309 N.L.R.B. 1348 (1992). However, the Board was fractured on the analysis of § 502, and no single reasoning commanded a majority.

The Union appealed and on February 14, 1995, the D.C. Circuit remanded the case to the Board, stating that it could not discern a Board position, and that the Board had failed to articulate an appropriate legal standard for the resolution of the case. The court held that "[t]he Board must 'articulate a majority-supported statement of the rule that [it] will be

*Universal Camera*, 340 U.S. at 487. In the present case, three of the four pieces of evidence relied upon by the Board are not terribly persuasive, and one piece of evidence (the respirator use) is either irrelevant to the danger inquiry or evidence of improved conditions. When we also take into account the NRC and TDRH standards and those agencies' lack of decisive regulatory action as evidence contradicting that evidence, it becomes clear that the Board's conclusion – that objective evidence supported the employees' belief that their workplace had become too dangerous to work in – is simply not supported by substantial evidence on the record considered as a whole.

### Inexcusable Delay

Since courts are to be deferential in reviewing agency determinations, denying enforcement of an order solely on the basis of delay is inappropriate. *See, e.g., NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 480*, 466 U.S. 720, 725 (1984) (per curiam); *NLRB v. J.H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 265-66 (1969). This is because, in situations where the questioned award would be payment or action in favor of the company's employees, "the Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers." *J.H. Rutter-Rex Mfg. Co.*, 396 U.S. at 265.

Still, the Administrative Procedures Act holds, "[w]ith due regard for the convenience and necessity of the parties or their representatives and *within a reasonable time*, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b) (2002) (emphasis added). Accordingly, courts sometimes refuse to enforce agency awards when undue delay has made their enforcement inequitable. *See, e.g. Emhart Indus. v. NLRB*, 907 F.2d 372, 378-80 (2d Cir. 1990) (refusing enforcement after six-year delay).

This circuit has followed a rule under which it will enforce Board decisions, even if delayed, when there is "'no allegation that the delay has in any way prejudiced [the

exceed the non-binding guideline set out by the NRC, they are within the standard promulgated by the U.S. Army and adopted by the TDRH, and there is no evidence in the record to suggest that the Army guidelines are not equally good measures of safety.

So, in other words, the pieces of evidence relied upon by the Board as providing objective evidence to support the TNS employees' belief that their workplace was abnormally dangerous merely show that TNS had largely complied with regulatory limits set with a considerable margin for safety.

As we explained above, a lack of emergency action by the NRC or its state counterpart does not prohibit, as a matter of law, an NLRB finding that objective evidence existed to support the employees' belief that their workplace was too dangerous to work in. However, at the same time, the existence of regulatory oversight, the power of the regulator to take emergency remedial action, and the decision not to do so must count for something. In the same way, concrete health measurements within the limits promulgated or adopted by those agencies also must count. The NLRB is not free to discount these facts completely and find evidence of abnormal danger in the face of them without further support. For instance, there could be egregious evidence simply not addressed or understood by the regulator, or the regulator could have been moving too slowly for the circumstances, or it could be that the regulator was not fully apprised of or in control of the situation. Non-action by the relevant regulator is certainly not *ipso facto* proof of a lack of abnormal danger, but it must weigh against a finding that the employees' belief that their workplace was too dangerous to work in was supported by objective proof.

As mentioned above, the Supreme Court has instructed that when reviewing fact-finding by the Board, courts are to determine whether the findings of fact are supported by substantial evidence by taking into account the evidence upon which the Board relies and "contradictory evidence or evidence from which conflicting inferences could be drawn."

applying now and in the future.'" *Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 46 F.3d 82, 92 (D.C. Cir. 1995) (quoting *United Food & Commercial Workers Int'l Union v. NLRB*, 880 F.2d 1422, 1436-37 (D.C. Cir. 1989)).

More than four years later, on September 30, 1999, the Board issued its Second Supplemental Decision and Order, 329 N.L.R.B. No. 61, reaching a decision contrary to its earlier position. The second decision found § 502 applicable to the job action, and it found that TNS had engaged in unfair labor practices by hiring permanent replacement workers and refusing to rehire the employees involved. In finding § 502 applicable to the present case, the decision set up a new four-part test for determining the applicability of § 502 in cases involving cumulative slow-acting dangers to employee health and safety:

The General Counsel must demonstrate by a preponderance of the evidence that the employees believed in good faith that their working conditions were abnormally dangerous; that their belief was a contributing cause of the work stoppage; that the employees' belief is supported by ascertainable, objective evidence; and that the perceived danger posed an immediate threat of harm to employee health or safety.

*TNS, Inc. and Oil, Chem. and Atomic Workers Int'l Union*, 329 N.L.R.B. No. 61, 1999 WL 818610, at *2 (Sept. 30, 1999). As mentioned above, the decision ordered that TNS reinstate and provide back pay to the employees who took part in the work stoppage. It is from this order that TNS appeals to this court, and it is this order that the Board asks this court to enforce.

## II

### TNS's Challenges to the Board's Statutory Interpretation

We first address TNS's challenges to the Board's various acts of statutory interpretation. In reviewing NLRB

interpretations of the NLRA, this court follows the standard set out by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). *See NLRB v. Webcor Packaging*, 118 F.3d 1115, 1119 (6th Cir. 1997) (applying *Chevron* to NLRB interpretations of the NLRA); *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996) (applying *Chevron* to a Board decision). Under this standard, the court first asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, the court must give effect to Congress's interpretation. *Id.* at 842-43. However, if Congress has not clearly spoken to a question, this court is limited to determining "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. *Accord Holly Farms*, 517 U.S. at 398-99. In applying this "permissible construction" standard, this court must uphold the Board construction if it is "permissible" and "reasonable," even if it is not the only construction the Board might have adopted and even if it is not the one that this court would have adopted if faced with the question *de novo*. *Chevron*, 467 U.S. at 843-44 and n.11.

1.    *Whether the Board erred in interpreting § 502 to apply in situations where there is no "no-strike" provision*

TNS first argues that § 502 does not apply to this situation at all, because § 502 only applies to situations where employees are bound by either a contractual or implied "no-strike" provision. Accordingly, TNS contends that the Board erred in interpreting § 502 to cover situations – such as the present case – where the relevant employees are not bound by such a provision. There is both case law and logical support for the argument that § 502 should apply only to situations involving a "no-strike" provision, thereby making it a difficult question; however, since there is also support for the Board's interpretation, and because we are to review the Board's statutory interpretations under the deferential *Chevron* standard, we must affirm the Board's interpretation.

published by the United States Army for testing uranium levels in employees' kidneys (the DARCOM standard). The DARCOM manual set a "notice" level of 50 ug/l and an "action" level of 100 ug/l. Again, there was a great deal of discussion in the record in this case about varying results at varying times; however, both parties and the Board agree with the conclusion of the NIOSH report that from 1977-1981, 52% of TNS employees had one or more urine samples greater than the DARCOM notice level of 50 ug/l and 19.5% had one or more samples above the action level of 100 ug/l. The NIOSH report did not set forth statistics illustrating whether any employees had uranium-in-urine concentrations at or above the danger level of 130 ug/l set by the NRC guideline. However, the report summarily stated that "urine uranium concentrations exceeded NRC guidelines for bioassay at uranium mills, but not the less stringent [DARCOM] standards enforced by the state." So, just as with the whole body exposure data, the uranium-in-urine data relied upon by the Board as providing objective evidence to support the employees' belief that their workplace was abnormally dangerous consisted of scientific measurements within the limits set by the relevant nuclear regulatory agency.

These facts are important not because they show TNS complying with regulatory rules, but because the limits as set by the NRC and adopted by the TDRH are established with a considerable margin for safety, such that when complied with, no injury would be expected in the exposed workforce. *See Johnson v. United States*, 597 F. Supp. 374, 424-25 (D. Kan. 1984). As the NRC itself has explained, its dose limits incorporate a "significant safety factor" so that substantial injury or damage should not occur unless exposure exceeds those limits by a "significant multiple." 10 C.F.R. § 140.81(b)(1) (2002). Indeed, even the ALJ recognized the value of reference to the limits set out by the regulatory agencies. She wrote, "I can conceive of no more objective means to assess whether the TNS employees were subjected to abnormal dangers than to examine the evidence in this case in light of the administrative standards." *TNS*, 309 N.L.R.B. at 1437. While the urine samples pointed to by the Board

in other parts of the uranium fuel cycle and other U.S. nuclear industries."

*Id.* at 1354. The TDRH had adopted NRC regulations stating that external exposure to radiation was not to exceed 5 rems per year. Therefore, according to the Board's reading of the facts, TNS's workers – while apparently receiving higher than average exposure for United States nuclear industries – did not receive radiation exposure above that permitted by NRC/TDRH regulations. [3]

Finally, the Board mentioned the uranium-in-urine levels of TNS's employees. Since the DU used in the manufacturing process at TNS's facility is both a low-level radioactive material and a toxic heavy metal, the TDRH monitored safety levels at the plant with respect to exposure to radiation and intake of uranium. There was no NRC regulation on permissible uranium levels in employees' kidneys; there was only a non-binding guideline, the usefulness of which the parties dispute. The NRC guideline stated that workers face a "[p]ossibility of kidney damage" if any single urine sample shows greater than 130 micrograms of uranium per liter of urine (ug/l). *See* NRC Reg. Guide 8.22 (1987). The guideline set a "notice" level of 15 ug/l and an "action" level of 30 ug/l. The "notice" level is essentially an alarm signal, at which the cause of the elevated sample should be investigated; when the "action" level is reached, the employee is to be removed from his or her work area until their uranium-in-urine level falls.

However, the guideline had never been adopted by the NRC, and the TDRH used the more permissive standard

---

[3]In so concluding, the Board focused on average whole body uranium levels. However, the NIOSH report recognized that individual exposure levels were a more accurate consideration. A review of the NIOSH report upon which the Board based its factual conclusions reveals that one TNS worker in 1977 and two workers in 1978 had whole body exposures equal to or greater than 5 rems. However, according to the report, no TNS worker was exposed to 5 rems or more after 1978. Therefore, according to the NIOSH report, TNS was in complete regulatory compliance in this regard.

---

TNS cites several cases as support for the proposition that § 502 applies only in the context of a "no-strike" provision. *See, e.g., Whirlpool Corp. v. Marshall*, 445 U.S. 1, 18 n.29 (1980) (the "effect of this section is to create an exception to a no-strike obligation in a collective-bargaining agreement."); *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 385 (1974) ("This section provides a limited exception to an express or implied no-strike obligation," thereby insulating participants from injunctions, liability for damages, or termination when a cessation of work is necessary "to protect employees from immediate danger."); *Plain Dealer Publ'g Co. v. Cleveland Typographical Union No. 53*, 520 F.2d 1220, 1228 (6th Cir. 1975) ("This recognition of a right to refuse to work provides a limited exception to an express or implied no-strike obligation." (citing *Gateway Coal*)); *NLRB v. Tamara Foods, Inc.*, 692 F.2d 1171, 1183 (8th Cir. 1982) (finding § 502 inapplicable in a case where there was no collective bargaining agreement); *Knight Morley Corp.*, 116 N.L.R.B. 140, 146 (1956), *enforced,* 251 F.2d 753 (6th Cir. 1957) (holding that § 502's purpose was to give employees a right to walk off the job because of abnormally dangerous conditions "even in the face of a no-strike clause in their contract with an employer").

Further, there is logical support for the idea that § 502 only applies when employees are faced with either a contractual or implied "no-strike" provision. If §502 were so interpreted, the section would exempt workers who quit work out of concern for their safety from the injunctions and damage actions that usually follow work stoppages in contravention of these provisions. One might argue that an employee not so constrained is free to make a decision as to whether he wants to work in a potentially dangerous situation without the threat of an injunction or damage action, and so he is not in need of the protections of § 502.

However, as both sides admit, there is nothing in the legislative history of either § 502 or the NLRA more generally that addresses "no-strike provisions." As explained above, in the absence of an express congressional imperative one way

or the other, the *Chevron* standard serves to protect the Board's interpretation as long as it is "reasonable." *See Chevron,* 467 U.S. at 843-44. In this case, the Board has a reasonable answer to almost all of the support cited by TNS. First, all of the cases discussing the issue, except *Tamara Foods*, 692 F.2d at 1183, were dealing with situations where either an express or implied "no-strike" provision was in effect. It is a different thing to say that § 502 is an exemption to "no-strike" provisions when there is a no-strike provision than it is to say that § 502 applies *only* when there is a "no-strike" provision. The only case that even arguably says "only" is the Eighth Circuit's *Tamara Foods* decision. However, this case is distinguishable in that, although it discusses no-strike clauses and § 502, it actually finds the section inapplicable because there was no "collective bargaining agreement," not because there was no "no-strike" clause. *Ibid.* Further, *Tamara Foods* merely quotes without discussion the language of *Whirlpool* suggesting that § 502 is an exception to a no-strike provision (which, as already mentioned, makes its assertion in a case where a "no-strike" provision *was* in effect). *Ibid*.

From a logical standpoint, there is also an argument favoring the Board's position. If § 502 is interpreted to provide job protection to employees engaged in a protected work stoppage, it would seem somewhat anomalous to provide this protection to unionized employees subject to a collective bargaining agreement that includes a no-strike clause but deny it to unionized employees not working under such a collective bargaining agreement and to all non-unionized employees. Further, while it is true that several administrative law judges have held § 502 to be limited in this way, up until now the Board has expressly reserved ruling on the issue. See *Beker Industries Corp.*, 268 N.L.R.B. 975, 975 n.1 (1984); *Gibraltar Steel Corp.*, 273 N.L.R.B. 1012, 1012 n.2 (1984). Now, however, the Board has so ruled and this court is bound to uphold its determination under the *Chevron* standard of review, because Congress has not spoken on the issue and the Board's interpretation is reasonable.

Engineering controls, such as ventilation equipment, should keep the amount of DU dust in the air below MPC. In the event that these controls were ineffective at keeping dust below MPC, TDRH regulations called for the use of respirators to keep the dust out of employees' lungs. In January 1981, TNS had instituted a program of respirator use for areas of its plant with excessive dust levels. New equipment to reduce dust levels in the air had been ordered, and the ventilator program was set to continue until August 1981, when that equipment would be installed. The ALJ discussed at length TNS's ventilator use, noting likely violations of TDRH ventilator policies and the discomfort experienced by employees forced to wear them. *See TNS*, 309 N.L.R.B. at 1410-12 (the ALJ decision is reprinted in the Board's first *TNS* decision, beginning at 1388). However, the use of ventilators is better read as a response to potentially dangerous conditions rather than a dangerous condition itself; in this way, TNS's ventilator policy is either unrelated to, or an amelioration of, a potentially dangerous condition facing the employees.

Therefore, both airborne dust levels and ventilator use are only tangential to the real focus of the Board's inquiry – objective evidence of danger to the employees' health. The third factor underlying the ALJ and Board decisions, the contention that average whole body uranium exposures at TNS were greater than typical for the nuclear industry, speaks directly to employee health concerns. The Board summarized the basis for this factor in its first *TNS* decision. The Board explained that the TDRH called in the National Institute of Occupational Safety and Health (NIOSH) to investigate the TNS facility in late 1981, and quoted from the resultant NIOSH report in noting:

NIOSH found that "whole body doses for production workers from 1975 to 1980 ranged from 1.06 rems to 2.16 rems," with none having "ever exceeded 5 rems per year whole body dose" since 1978. NIOSH concluded that these doses, "while for the most part within legal limits, were higher than doses observed among workers

the record.  However, in finding that its third requirement was fulfilled, namely that objective evidence supported the TNS employees' good faith belief that their workplace was abnormally dangerous, the Board merely cited without explanation four factors listed by the ALJ in her decision:

(1) air quality at the facility exceeded MPC [maximum permissible concentration] at 11 work stations for at least the last quarter preceding the strike; (2) the protracted use of respirators by a substantial number of employees was deleterious to their health; (3) the employees' average whole body uranium exposures were far greater than those typical for the nuclear industry; and (4) that repeated and excessive uranium-in-urine levels indicated serious risk of kidney damage.

*TNS*, 1999 WL 818610, at *12.  The Board held that this evidence "constitutes objective proof supporting [the employees'] belief that their workplace had become too unsafe an environment to continue working." *Ibid.*

One must go back to the ALJ's decision in this case to fill out the details of the facts cited by the Board as supporting the employees' belief that their workplace was too dangerous to work in.

The first piece of evidence cited by the Board dealt with the amount of DU dust in the facility's air.  Since the DU used in the manufacturing process at TNS is a low-level radioactive material, the TDRH set a standard for the MPC of airborne DU particles, defined as the amount of airborne radioactive material beyond which no worker is to be exposed for 40 hours per week for 13 weeks.  Though there is a great deal of back and forth in the record with respect to its significance, it is undisputed that both company records and TDRH inspections revealed DU dust in excess of MPC at some workstations in the TNS plant.

However, the second piece of evidence cited by the Board, that employees were wearing respirators, was in direct response to the high levels of DU dust found to be in the air.

2.    *Whether the Board erred in interpreting § 502 to require only a good faith belief on the part of the employees that abnormally dangerous conditions exist, as opposed to requiring that abnormally dangerous conditions actually exist*

The Board's newly adopted test for § 502 applicability is premised on the idea that § 502 requires a good faith belief in the existence of abnormally dangerous working conditions and that the belief be supported by ascertainable, objective evidence.  TNS argues that this is incorrect – that abnormal danger-in-fact is required before § 502 will apply to a work stoppage.  While, again, there are arguments supporting TNS's interpretation of § 502, *Chevron* again compels this court to affirm the Board's contrary interpretation.

In support of its position, TNS states that the Supreme Court in *Gateway Coal* dictated an approach requiring such a standard.  It is true that *Gateway Coal* can be read this way, as it requires "objective evidence that [abnormally dangerous] conditions *actually obtain*." *Gateway Coal*, 414 U.S. at 386 (emphasis added).  *Gateway Coal* goes on to state that "a union seeking to justify a contractually prohibited work stoppage under § 502 must present 'ascertainable, objective evidence supporting its conclusion that an abnormally dangerous condition for work exists.'" *Id.* at 386-87 (quoting *Gateway Coal Co. v. United Mine Workers of America*, 466 F.2d 1157, 1162 (3d Cir. 1972) (Rosenn, C.J., dissenting)).

TNS also cites *NLRB v. Fruin-Colnon Construction Co.*, 330 F.2d 885, 892 (8th Cir. 1964), which held that employees leaving their jobs because of dangerous conditions risk discharge because of their no-strike clause "should proof later of the physical facts fail to support their prior belief." Further, TNS points out that the Board has followed this view in the past, holding that "[i]t is well settled that Section 502 applies only where it has been objectively established that the working conditions are abnormally dangerous." *Goodyear Tire & Rubber Co.*, 269 N.L.R.B. 881, 881 (1984) (Board overruling an ALJ decision holding that § 502 protects

employees with only a good faith belief that abnormally dangerous conditions exist).

However, there are again responses to TNS's arguments. For example, though the language quoted above from *Gateway Coal* seems to support TNS's reading of § 502, *Gateway Coal* actually deals with a situation where a striking union claimed § 502 protection based solely on their claim of subjective belief of abnormal danger. The union offered *no* objective evidence to back up this claim, and it was on this basis that the Court held that § 502 did not apply. *Ibid.* As for the Eighth Circuit's *Fruin-Colnon* decision, this too was a situation virtually devoid of any evidence of abnormal danger. *See Fruin-Colnon*, 330 F.2d at 892 (rejecting § 502 applicability when evidence of abnormal danger was "based upon isolated testimony of the alleged discriminatees and unreasonable inferences which are unsubstantial considering the record as a whole").

Further, while there is case law tending to support TNS's reading of § 502, there is also case law that clearly supports the Board's interpretation. For example, this circuit has held that the important question in a § 502 situation is not whether abnormal danger actually existed, but whether it was shown by objective evidence that the employees' working conditions "might reasonably be considered 'abnormally dangerous.'" *Knight Morley*, 251 F.2d at 759. In so holding, this court wrote that § 502 "expressly limits the right of management to require continuance of work under what the employees in good faith believe to be 'abnormally dangerous' conditions." *Ibid.*

There is also persuasive authority to support the Board's position. For example, in *Banyard v. NLRB*, 505 F.2d 342, 348 (1974), the District of Columbia Circuit rejected the notion that § 502 sets up an unsafe-in-fact standard. Instead, the *Banyard* court explained that the issue in § 502 cases is whether, "in the Board's own language, 'the actual working conditions shown to exist by competent evidence might in the

to work under conditions that the employee reasonably believes pose an imminent risk of death or serious bodily injury, and (2) the employee has reason to believe that there is not sufficient time or opportunity either to seek effective redress from his employer or to apprise OSHA of the danger.

Nothing in the Act suggests that those few employees who have to face this dilemma must rely exclusively on the remedies expressly set forth in the Act at the risk of their own safety. But nothing in the Act explicitly provides otherwise. Against this background of legislative silence, the Secretary has exercised his rulemaking power under 29 USC §§ 657(g) (2), and has determined that, when an employee in good faith finds himself in such a predicament, he may refuse to expose himself to the dangerous condition, without being subjected to "subsequent discrimination" by the employer.

*Whirlpool*, 445 U.S. at 10-11. While there are certainly differences between this case and *Whirlpool* (for example, here there is no express rule from the Secretary of Labor permitting the action based on good faith belief and the provisions are under different statutes with different purposes and goals), this case represents analogous support for the proposition that the Board can find a permissible basis for employees to engage in a work stoppage based on radiation safety even in the absence of decisive action by the NRC.

Having rejected the proposition that the NLRB can not, as a matter of law, find that objective evidence supports employees' belief in abnormally dangerous working conditions when relevant regulatory agencies have chosen not to take immediate or emergency action, we must consider whether the Board's factual finding of objective evidence in *this* case is supported by substantial evidence.

As would be expected in a case with the complicated procedural history of this one, there is extensive evidence in

build a credible case that abnormal danger existed, thereby providing a basis for a protected job action (which, of course, might be used manipulatively to secure unrelated concessions). Some may argue that the NRC's bright line rules and radiation guidelines would therefore be undermined by companies having to worry not just about the NRC but also about the NLRB in their radiation programs. However, this practical consideration is for the time being merely speculative, as the Board argues rightly that it did not make a decision contrary to NRC findings, but merely found objective evidence (in part based on NRC & TDRH non-compliance letters) to support the employees' good faith belief that their workplace was abnormally dangerous.

Further, leaving policy decisions aside, there is at least some support for the Board's determination that it need not defer completely to the NRC. In the Supreme Court's *Whirlpool* decision, 445 U.S. at 8-11, the Court was asked to decide the validity of a rule promulgated by the Secretary of Labor, which allowed workers to refuse to engage in work they in good faith believed to be dangerous. Arguments against the rule included the facts that the Occupational Safety and Health Act (OSH Act) did not explicitly provide for this type of protected refusal, and that the employees already had an avenue for redress of safety concerns through the OSH Act by direct complaint to OSHA, the agency charged with enforcing the act. The Court found that, despite the existence of an administrative agency charged with evaluating safety, there were times when it would be necessary for employees to take matters into their own hands. Discussing the validity of the rule allowing employees to refuse certain jobs, even when OSHA had not prohibited workers from performing them, the Court wrote:

> [C]ircumstances may sometimes exist in which the employee justifiably believes that the express statutory arrangement [the OSH Act] does not sufficiently protect him from death or serious injury. Such circumstances will probably not often occur, but such a situation may arise when (1) the employee is ordered by his employer

circumstances reasonably be considered "abnormally dangerous."'" *Ibid.*

Finally, although the Board has used language in prior cases suggesting the use of a danger-in-fact standard, the Board has also found § 502 applicable to work stoppages where it was determined that the complained-of working conditions were not in fact abnormally dangerous. However, objective evidence of abnormal danger was required to support the employees' belief. *See Roadway Express*, 217 N.L.R.B. 278, 280 (1975) (an experienced truck driver's opinion that a truck was unsafe, when that opinion was shared by other drivers, was "objective enough" evidence under § 502 "to lead a person to reasonably determine that he should not drive such a truck"); *Redwing Carriers, Inc.*, 130 N.L.R.B. 1208, 1209 (1960) ("What controls is not the state of mind of the employee . . . concerned, but whether the actual working conditions shown to exist by competent evidence might in the circumstances reasonably be considered 'abnormally dangerous.'").

In short, again, there is evidence to support the interpretations adopted by both sides. Therefore, the question comes down to one of standard of review. TNS argues that the Board is not entitled to deference in its statutory construction here, because it contends Congress has spoken on this issue. The Company points to the text of § 502, which provides its protection to the "quitting of labor by an employee or employees in good faith *because of* abnormally dangerous conditions for work." According to TNS, this language clearly expresses Congress's intent that § 502 only cover cases where abnormally dangerous conditions actually exist.

While it is true that Congress *could* have drafted a clearer expression of its intent, it is not true that it did in the present case. The text of § 502, taken as a whole, is open to both interpretations, as is evident from the extensive case law discussed above attempting to interpret the statute (and coming out on both sides). As the Supreme Court has

explained, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In this case, Congress's intent on this specific issue is ambiguous, and therefore this court must apply the deferential *Chevron* standard of review to the Board's interpretation. Since the construction put forward is both permissible and reasonable, this court must uphold the Board's determination that § 502 requires only a good faith belief – supported by ascertainable, objective evidence – in the existence of abnormally dangerous working conditions.

3.    *Whether the Board erred in interpreting § 502 to prohibit companies from permanently replacing workers who quit work because of abnormally dangerous conditions*

TNS's final challenge to the Board's statutory interpretation is that the Board incorrectly interpreted § 502 to preclude employers from permanently replacing workers engaged in a § 502 work stoppage. TNS argues that an employer should have the same right to replace workers who participate in a § 502 work stoppage as it does to replace any other employees who engage in work stoppages not caused or prolonged by employer unfair labor practices. *See NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345-46 (1938) (holding that an employer may replace striking workers with others to carry on business so long as the employer is not guilty of unfair labor practices). *See also Belknap, Inc. v. Hale*, 463 U.S. 491, 504 n.8 (1983) (holding that absent evidence of an independent unlawful purpose, it is to be presumed that an employer's motive in permanently replacing its employees is to serve the legitimate business interest of continuing its operation). TNS claims that because it has not engaged in an unfair labor practice (governed by § 8 of NLRA), it should be permitted to permanently replace workers striking under § 502.

countermands the determinations of agencies with that expertise, and thereby frustrates broader purposes. *See* LPA, Inc. and the Nat'l Ass'n of Mfrs. Br. at 7-8. As an example, in speaking particularly of the NRC, the Sixth Circuit has joined with almost every other circuit in holding that NRC safety regulations conclusively establish the duty of care owed by defendants in radiation safety personal injury cases governed by the 1998 amendments to the Price-Anderson Act. *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1552-53 (6th Cir. 1997).

As for the Board, it has in the past accepted agencies' standards and regulations governing the agencies' areas of concern in determining whether a claim of abnormal danger was proven by objective facts. *See Goodyear*, 269 N.L.R.B. at 881 (Board rejected § 502 claim of abnormal danger, relying in part on manufacturer's statements that federal regulatory agencies had not restricted use of product); *Daniel Constr. Co.*, 264 N.L.R.B. 770 (1982) (Board affirmed that employee's refusal to work in radiation area did not fall under § 502, because no objective evidence was found to support danger claim and there was apparent full federal regulatory compliance); *Baker Marine Corp.*, 258 N.L.R.B. 680 (1981) (Board rejected § 502 claim of abnormal danger after ALJ noted procedures within OSHA safety standards).

However, in the present case, the Board did not find "abnormally dangerous" a condition that the NRC did not find dangerous. It found merely that there was objective evidence to support the employees' belief that their working conditions were abnormally dangerous. There is a practical concern that this is merely splitting hairs and that by permitting employees § 502 protection for work stoppages in cases where regulatory agencies have not seen the need to act decisively, the Board would effectively be setting higher (and different) standards for nuclear safety than those set by the expert agencies. One might argue accordingly that companies would then be forced to continue to comply with the nuclear agencies' requirements, but at the same time make sure that – despite the companies' compliance – employees were not able to

safety exist[s]." *TNS*, 309 N.L.R.B. at 1351 (quoting TDRH Inspection Report from March 9-10, 1981 inspection).

TNS argues that where an expert agency, monitoring the situation, and having authority to shut down the workplace or remove employees from their jobs for safety or health reasons, has not taken such action, appropriate deference to that agency's expertise requires that the Board apply a presumption that no "abnormal danger" exists.

The Board responds that it did not find that working conditions were in fact abnormally dangerous; rather it found that employees possessed a good faith belief that their workplace was abnormally dangerous and that objective evidence supported that belief. So, as the Board states in its brief to this court, even if the NRC and the TDRH found that no abnormal danger existed at TNS, the NLRB "still would not have been compelled to dismiss the complaint, provided that the objective record evidence before it showed that conditions at the time of the work stoppage might reasonably be considered abnormally dangerous." NLRB Br. at 37. Further, the Board contends that it did not, by its finding, make the findings of the NRC and the TDRH irrelevant; on the contrary, the Board used citation letters from the TDRH, charging TNS with violations of radiation safety standards, as the basis for its finding that there was enough objective evidence to support the employees' good faith belief.

In general, courts have held that scientific regulatory agencies such as the NRC should be given extreme deference within their area of expertise. *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *Fed. Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463 (1972); *Browning-Ferris Indus. v. Muszynski*, 899 F.2d 151, 160 (2d Cir. 1990) ("Courts should be particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise."). As one amicus brief pointed out, this deference promotes efficiency, avoids unnecessary duplication of effort and helps to avoid the situation where an agency without expertise in an area

This argument fails in this court, once again, because of the *Chevron* doctrine. In the absence of a clear textual description of what protections are to be offered to employees engaged in § 502 actions, the Board has interpreted § 502 to protect covered employees from being permanently replaced. Since this interpretation is supported by logic, it is reasonable and must be upheld.

This interpretation is supported by reason in several ways. First, as the Court recognized in *Gateway Coal*, 414 U.S. at 387, § 502 confers "special protection" on employees who quit work in the good faith belief that their workplace is abnormally dangerous; however, this protection is meaningless if companies can simply replace these employees as if they were normal economic strikers. Though this court has not discussed this issue specifically, the Board's determination that employers may not permanently replace employees who engage in § 502 job actions conforms with this court's holding that "[w]hen a work stoppage properly results from abnormally dangerous working conditions, an employer cannot resort to the weapons available to him in an economically-motivated work stoppage." *Clark Eng'g & Constr. Co. v. United Bhd. of Carpenters & Joiners*, 510 F.2d 1075, 1080 (6th Cir. 1975).

More generally, the Supreme Court has held that a company's refusal to reinstate strikers is unlawful unless it is based on a legitimate and substantial business justification. *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967). As TNS points out, the Court in *Mackay Radio*, 304 U.S. at 345-46, held that permanent replacement of economic strikers is a legitimate business purpose. However, the Board concluded as a matter of statutory interpretation that this is not legitimate in the case of a § 502 action, because it would defeat part of the purpose of allowing workers faced with abnormal danger to take job action if they could simply be replaced with new workers who may not be aware of the dangerous conditions. As mentioned, Congress has not spoken on this issue and the Board's interpretation is

reasonable; as such, we are bound by *Chevron* to uphold the Board's interpretation.

### TNS's Challenges to the Board's Application of its § 502 Test to the Facts of the Present Case

This court having rejected TNS's various arguments for why the Board's four-part test is not a permissible interpretation of § 502, we now turn to TNS's challenges to the Board's application of its test to the facts of this case. As noted above, in determining that § 502 applied to the TNS employees' work stoppage, in a situation involving "cumulative, slow-acting dangers to employee health and safety," the Board held that the NLRB General Counsel had successfully proven by a preponderance of the evidence that (1) the employees believed in good faith that their working conditions were abnormally dangerous; (2) the belief was a contributing cause of the work stoppage; (3) the employees' belief was supported by ascertainable, objective evidence; and (4) the perceived danger posed an immediate threat of harm to employee health or safety. *TNS*, 1999 WL 818610, at *2. However, with respect to the last requirement, the Board noted that, due to the nature of cumulative, slow-acting dangers, "there will probably not be a single moment when 'immediate' departure from the workplace is obviously necessary." *Id.* at *11. Defined so loosely, the fourth requirement is not difficult to fulfill; possibly for this reason, TNS principally argues that the Board erred in finding that the first, second, and third requirements were fulfilled.

On review by this court, findings of fact made by the Board are conclusive if supported by substantial evidence on the record considered as a whole. *See* 29 U.S.C. § 160(f) (2002). Though deferential, this standard of review is not trivial. As the Supreme Court has pointed out, it is not enough merely to verify that there is evidence to support the Board's determination "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951). Instead, the review must also "take into account

("the safety of nuclear technology [is] the exclusive business of the Federal Government"), Congress delegated exclusive licensing and regulatory authority to the Atomic Energy Commission, which was replaced by the Nuclear Regulatory Commission (NRC) in 1974. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 63 (1978). Specifically, Congress gave the NRC authority to regulate nuclear materials to protect "public health and safety." 10 C.F.R. § 1.11(b) (2002).

In turn, pursuant to 42 U.S.C. § 2021, Congress provided that the NRC may delegate certain aspects of nuclear regulation to states. *See* 42 U.S.C. § 2021 (2002). Under this provision, state regulatory agencies may assume regulatory authority for low-level radiation, subject to NRC regulations. Tennessee became such an "agreement state" in 1965 and, as a result, the Tennessee Division of Public Health, Division of Radiological Health (TDRH) regulates facilities such as TNS, although it utilizes NRC guidelines to accomplish the regulation. The TDRH conducts periodic inspections of the nuclear facilities it regulates to ensure that they are in compliance with regulations, and NRC officials join TDRH inspectors on occasion. The TDRH has the legal authority to close a facility by suspending or revoking its license to operate in the state.

From 1979 onwards, the TDRH conducted semi-annual inspections of TNS's operations. There is conflict between the parties as to whether TNS was in full compliance with NRC and TDRH regulations. However, if nothing else, there seems to be no contention that the agencies found conditions at the plant to be immediately dangerous, as evidenced by the fact that they might have taken decisive regulatory action against the Company and did not. Even the Board recognizes this, having quoted in its first decision language from the report of the last TDRH inspection of the TNS plant prior to the job action: "inplant site is not as contaminated as noted several years ago . . . . There are many areas that need improvement and constant updating but it appears that at the present time no crisis or eminent [sic] threat to health and

objective evidence" of abnormal danger. The Board did this in a situation where, although the relevant nuclear regulatory agencies sent non-compliance letters and cited violations, the agencies did not see an immediate and serious danger warranting decisive action. With that in mind, TNS argues in its final challenge to the Board's factual findings that this court should overturn the Board's finding that evidence supported the employees' belief in abnormal danger.

TNS can be read to be making two different arguments on this score, and we will deal with each in turn. First, TNS argues that, as a matter of law, the Board can not find that objective evidence supports the employees' belief in abnormal danger when the relevant nuclear regulatory agencies are actively monitoring the Company's operations and find no cause to order closure or any type of emergency remedial action. We reject that argument. Alternatively, TNS might argue that, in the present case and given the monitoring and inaction by the regulatory bodies, the actual findings of facts relied upon by the Board as providing evidence supporting the employees' belief were insufficient to support the Board's finding. Utilizing the standard of review with which this court examines NLRB fact-finding, this argument would require us to hold that the Board's determination was not supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f) (2002). We agree with this argument.

We first address TNS's argument that the Board could not, as a matter of law, find objective evidence to support the employees' belief in the face of regulatory non-action. However, before addressing this argument, it is necessary to review the nuclear regulatory scheme in general and the agencies' actions with respect to TNS's operations.

As part of the complete federal preemption of nuclear safety, *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 249 (1984) (federal government occupies entire field of nuclear safety); *Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 208 (1983)

whatever in the record fairly detracts from its weight." *Id.* at 488. The Supreme Court has described this standard of review as "requiring a court to ask whether a 'reasonable mind might accept' a particular evidentiary record as 'adequate to support a conclusion.'" *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

4.  *Whether the Board erred in its factual determinations (1) that the TNS employees believed in good faith that their working conditions were abnormally dangerous and (2) that their belief was a contributing cause of the work stoppage*

The first two factual challenges made by TNS are best addressed together, as it is impossible to separate the proof of one from the proof of the other. Therefore, we first look at whether there is substantial evidence on the record as a whole to support the Board's factual findings that the TNS employees believed in good faith that their work conditions were abnormally dangerous and that this belief was a contributing cause of the work stoppage. We find that there is such evidence.

TNS makes a well-documented argument that the dangerous working condition claims were only a pretext for the striking employees' actual, economic motivations. In support of this contention, TNS points to the timing of the job action (at the expiration of the employees' collective bargaining agreement, at a time when negotiations with management seemed stalled). The Company also alleges that it received no official challenges by employees or the Union to health and safety conditions at the plant until after the March 1981 strike vote. Further, the Company cites Union discussions and graffiti placed on TNS property as evidence that the Union was focused on economic matters, and not workplace safety, at the time of the vote. Finally, the Company alleges that rank and file Union members were unaware of much of the "objective evidence" of danger that

the Board cites, and so even if there were such evidence, it could not have been a motivating factor for the walkout.

The picture painted by the Board's proffered evidence could not be more different. The Board cites frequent safety inspections and reports of complaints made by the Union since October 1980 as evidence of the employees' concern for their safety. Further, the Board notes that the ultimatum sent by the Union to the Company on March 10, 1981 stated that if the employees walked out, it would be because of alleged dangers in the workplace. The Board cites numerous discussions at Union meetings and numerous worries expressed by employees about the dangers caused by DU dust in the factory. The Union in its brief states:

> In the period leading up to the work stoppage, employees knew that, due to the Company's woefully inadequate dust control program, they were ingesting inordinate quantities of DU, and that several of them were experiencing disturbing medical symptoms associated with kidney dysfunction. TNS itself began to inform some employees that they had high levels of uranium in their urine . . . . The step TNS took in response to these developments . . . was to implement an obviously inadequate respirator program, which only made it more apparent that the employees' health was in grave peril.[2]

---

[2] Another description (though an admittedly one-sided one), based largely on evidence in the record, can be found in C. John Cicero, *TNS, Inc. – The National Labor Relations Board's Failed Vision of Worker Self-Help to Escape Longterm Health Threats from Workplace Carcinogens and Toxins*, 24 Stetson L. Rev. 19, 22 (1994):

> At the end of a workday in the company's foundry, the employees' faces and other exposed portions of their bodies were black from the dust, soot, and smoke. During one phase of the production process, employees packed depleted uranium in the form of "greensalt," a powdery, heavy radioactive compound, into pots by hand. The radioactive mixture routinely flew up from the pots and settled into employees' ears, nostrils, and mouths. Many employees discharged black mucus when they sneezed or blew their noses. An operator testified that "the black

In short, the evidence is strongly set out by both sides in twenty years of documents, transcripts, and testimony. However, given the standard of review that constrains this court in examining factual determinations of the Board, the mere fact that evidence goes both ways does not help TNS's case. Instead, in order to overturn the Board's factual findings with respect to the employees' beliefs and motivations, we would have to be able to say that the Board's determination is not supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f) (2002). We are unable to do that here.

5.   *Whether the Board erred in finding objective evidence of abnormal danger to exist in a plant regulated, monitored, and permitted to continue operation by the Nuclear Regulatory Commission and its state counterpart*

As mentioned above, in the course of finding that § 502 applied to the work stoppage at TNS, the Board found that the employees' good faith belief in the existence of abnormally dangerous conditions was supported by "ascertainable,

---

soot would make his hair stiff as brillo; he wore plugs to prevent dirt from entering his ears." Another employee kept a toothbrush at his work station to remove dusty particles which lodged in his teeth. Yet another testified how she "scrubbed her skin with a buffing pad at the end of the day to remove the black specks from her pores." When she asked TNS' Resident Safety Officer, Jim Barlow, whether tests could be performed to sample the black material that infiltrated the workers' nostrils, he told her that "such a test would be too costly." TNS' plant engineer acknowledged "that at the end of the workday, the foundry employees looked like coal miners."

> Conditions were no better in the penetrator shop. One employee testified that with the shop door opened, he "could see dust motes suspended in the air." He could not, however, see "the invisible concentrations of alpha particles which emanated from the airborne contaminants." Smoke from the furnace and the forge contributed to the "hazy and contaminated atmosphere," an atmosphere cooled by "mists bearing uranium metal specks which sprayed the operators' faces and clothing."